# EXHIBIT 1

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2       MIDDLE DISTRICT OF ALABAMA
3           EASTERN DIVISION
4
5   CASE NUMBER:    3:06-CV-528-WKW
6
7   RONNIE GILES,
8           Plaintiff,
9   VS.
10
11  MASTERBRAND CABINETS, INC.,
12          Defendants.
13          * * * * * * * * *
14
15          S T I P U L A T I O N
16
17      IT IS STIPULATED AND AGREED by and
18  between the parties, through their respective
19  counsel, that the deposition of RONNIE GILES
20  may be taken before Kelly Gray, CSR., at the law
21  offices of Laney & Foster, P.C., Two Perimeter
22  Park South, Suite 404 East, Birmingham, Alabama
23  35243, on the 5th day of April, 2007.

Page 2

1       IT IS FURTHER STIPULATED AND AGREED that
2   the signature to and the reading of the
3   deposition by the witness is hereby waived, the
4   deposition to have the same force and effect as
5   if full compliance had been had with all laws
6   and rules of Court relating to the taking of
7   depositions.
8       IT IS FURTHER STIPULATED AND AGREED that
9   it shall not be necessary for any objections to
10  be made by counsel to any questions except as to
11  form or leading questions, and that counsel for
12  the parties may make objections and assign
13  grounds at the time of the trial, or at the time
14  said deposition is offered in evidence, or prior
15  thereto.
16      IT IS FURTHER STIPULATED AND AGREED that
17  the notice of filing of the deposition by the
18  Court Reporter is waived.
19
20
21
22
23

Page 3

1           I N D E X
2
3   WITNESS: RONNIE GILES
4
5   DIRECT EXAMINATION BY MS. CREVELING........5
6
7   CERTIFICATE PAGE..........................140
8
9
10          E X H I B I T S
11
12  DEFENDANT'S 1...............................42
13  DEFENDANT'S 2...............................52
14  DEFENDANT'S 3...............................82
15  DEFENDANT'S 4...............................85
16  DEFENDANT'S 5...............................91
17  DEFENDANT'S 6...............................94
18  DEFENDANT'S 7...............................94
19  DEFENDANT'S 8..............................124
20  DEFENDANT'S 9..............................125
21
22
23

Page 4

1           A-P-P-E-A-R-A-N-C-E-S:
2
3   For the Plaintiff:  ARENDALL & ASSOCIATES
4       By:  Mr. Allen D. Arnold
5           2018 Morris Avenue
6           Birmingham, AL 35203
7
8
9   For the Defendant:  BAKER & DANIELS, LLP
10      By:  Ms. Kelly Creveling
11          300 N. Meridian Street
12          Suite 2700
13          Indianapolis, IN 46204
14
15
16
17
18
19
20
21
22
23

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 5

1    I, KELLY GRAY, a Court Reporter of
2  Birmingham, Alabama, acting as Commissioner,
3  certify that on this date, as provided by the
4  Alabama Rules of Civil Procedure and the
5  foregoing stipulations of counsel, there came
6  before me at the Law Offices of LANEY & FOSTER,
7  P.C., Two Perimeter Park South, Suite 404 East,
8  Birmingham, Alabama 35243, beginning at 10:00
9  a.m., RONNIE GILES, witness in the above cause,
10  for oral examination, whereupon the following
11  proceedings were had:
12
13         RONNIE GILES
14  a witness, being produced, sworn and examined on
15  behalf of the defendant, testified as follows:
16
17     BY THE REPORTER:  Usual stipulations?
18     BY MS. CREVELING:  Yeah.
19     BY MR. ARNOLD:  Yes.
20
21     DIRECT EXAMINATION
22  BY MS. CREVELING:
23  Q    Mr. Giles, we've met.  My name's Kelly

Page 6

1  Creveling.  I'm here today representing
2  MasterBrand Cabinets.  And before we get
3  started, I just want to go over a few items that
4  will make today's deposition flow much easier.
5  And your attorney may have already discussed
6  them you, but I find some of them are hard for
7  everybody to remember, so I'm going to go ahead
8  and cover them again this morning.  I think the
9  most important -- I guess two of the most
10  important are that you answer verbally.  So
11  "yes" or "no" or whatever narrative explanation
12  you have rather than shaking the head or saying
13  "uh-huh" or "huh-uh."  Because as we're sitting
14  here today we know -- we might know what each
15  other means, but it doesn't translate very well
16  into our transcript.  And then if you would
17  please allow me to finish my question before you
18  begin your answer.  If we're talking over each
19  other, we'll probably get the Court Reporter
20  upset and we'll hear from him.  So again, if you
21  would, just follow that rule.  I think it would
22  make our deposition today go much easier, all
23  right?

Page 7

1  A    Okay.
2  Q    Okay.  If at anytime you don't understand
3  my question or you don't hear my question, let
4  me know.  I would be happy to repeat it or
5  rephrase it for you.  However, if you answer the
6  question, I'm going to assume that you
7  understood the question, okay?
8  A    Okay.
9  Q    All right.  Well, let's go ahead and get
10  started then.  If you could give me your full
11  name, please.
12  A    Ronnie Giles.
13  Q    What's your date of birth, sir?
14  A    March 29, 1959.
15  Q    And where are you currently living?
16  A    3006 Pheasant Avenue.
17  Q    All right.
18  A    Opelika, Alabama.
19  Q    How long have you been at that address?
20  A    About four years and nine months,
21  approximately.
22  Q    Does anyone else live at that address
23  with you?

Page 8

1  A    Yes.
2  Q    Who does?
3  A    My wife and son.
4  Q    Okay.  What's your wife's name?
5  A    Lucretia Giles.
6  Q    And your son's name?
7  A    Rondez Giles.
8  Q    Can you spell that for me, please?
9  A    R-O-N-D-E-Z.
10  Q    How old is Rondez?
11  A    Twelve.
12  Q    All right.  Can you just give me a snap
13  shot of your educational background, please?
14  A    I finished high school in '77.
15  Q    Any college-type courses or training
16  courses post-high school?
17  A    One year at Alabama State University.
18  Q    What did you study at Alabama State?
19  A    I was going into business.
20  Q    Any other courses?
21  A    No.
22  Q    Okay.  Have you ever been involved in any
23  other lawsuits besides this one?

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 9

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | How about charges filed with any type of |
| 3 | | federal or state agencies? |
| 4 | A | Have I filed any? |
| 5 | Q | Yes, sir. |
| 6 | A | No. |
| 7 | Q | Okay. Have you ever filed for |
| 8 | | bankruptcy? |
| 9 | A | Yes. |
| 10 | Q | When was that? |
| 11 | A | I'm not sure. |
| 12 | Q | Just roughly by year. You don't need to |
| 13 | | give me an exact date. |
| 14 | A | I would say 1988. |
| 15 | Q | Were you in Alabama at the time it was |
| 16 | | filed? |
| 17 | A | Yes. |
| 18 | Q | Are you currently employed? |
| 19 | A | Yes. |
| 20 | Q | Where are you currently employed? |
| 21 | A | Weidmann Plastics. |
| 22 | Q | Where is that located? |
| 23 | A | Auburn, Alabama. |

Page 10

| | | |
|---|---|---|
| 1 | Q | How long have you worked for them? |
| 2 | A | One year and just under two months. |
| 3 | | Yeah, two months. |
| 4 | Q | So let's see, if you were terminated from |
| 5 | | MasterBrand in January of 2006, you began with |
| 6 | | Weidmann pretty quickly after that? |
| 7 | A | In February. |
| 8 | | BY MR. ARNOLD: Object to form. |
| 9 | Q | (continued by Ms. Creveling) I'm sorry. |
| 10 | | You can go ahead and answer. |
| 11 | A | In February. |
| 12 | Q | How long between when you were terminated |
| 13 | | from MasterBrand and started -- |
| 14 | A | One month. |
| 15 | Q | Did you collect unemployment in that one |
| 16 | | month? |
| 17 | A | No. |
| 18 | Q | Did you work anywhere else in that one |
| 19 | | month? |
| 20 | A | I worked at Area Realty. |
| 21 | Q | Okay. Any other employers at all, |
| 22 | | besides Area Realty and Weidmann Plastics, after |
| 23 | | leaving MasterBrand Cabinets? |

Page 11

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | What do you do at Weidmann Plastics? |
| 3 | A | I put their plastic parts together. |
| 4 | Q | What kind of things do they make? |
| 5 | A | They make -- it's hard to say. |
| 6 | Q | All right. |
| 7 | A | They make what they call at Weidmann, B |
| 8 | | Pillars. |
| 9 | Q | B pillars? |
| 10 | A | They use that section to go on car doors |
| 11 | | that run in the middle plastic part on the |
| 12 | | inside of the car. |
| 13 | Q | Okay. How did you find the job at |
| 14 | | Weidmann? |
| 15 | A | Friends. |
| 16 | Q | Friends referred you over there? |
| 17 | A | They talked about the former personnel |
| 18 | | manager from MasterBrand was there. |
| 19 | Q | Who was that? |
| 20 | A | Jimmy Allen. |
| 21 | Q | So there's somebody -- Jim Allen was the |
| 22 | | H.R. manager at MasterBrand at one point? |
| 23 | A | Yes. |

Page 12

| | | |
|---|---|---|
| 1 | Q | Who then went over to Weidmann Plastics? |
| 2 | A | Yes. |
| 3 | Q | Okay. And did they -- do they like Mr. |
| 4 | | Allen? I mean, was that a favorable thing or is |
| 5 | | that an unfavorable recommendation? |
| 6 | A | Favorable. |
| 7 | Q | Okay. And is Mr. Allen still at Weidmann |
| 8 | | Plastics? |
| 9 | A | Yes. |
| 10 | Q | What shift do you work there? |
| 11 | A | Third shift. |
| 12 | Q | Is that your preferred shift? |
| 13 | A | Yes. |
| 14 | Q | How much do you make there per hour? |
| 15 | A | $12.50. |
| 16 | Q | Is there a shift differential? |
| 17 | A | Yes. |
| 18 | Q | What do you get for the shift |
| 19 | | differential? |
| 20 | A | Fifty cents. |
| 21 | Q | Per hour; is that right? |
| 22 | A | Yes. |
| 23 | Q | Okay. What benefits do you have? |

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

| Page 13 | Page 15 |
|---|---|

**Page 13**

1  A    Medical and dental.

2  Q    Do you cover your whole family on those

3  benefits?

4  A    Yes.

5  Q    Do you know what you pay for those

6  coverages, approximately?

7  A    Approximately, $33.00 a week.

8  Q    Combined?

9  A    Yes.

10  Q    Okay.

11  A    Approximately.

12  Q    Okay. When you were at MasterBrand, did

13  you also have coverage for your whole family

14  there?

15  A    Yes.

16  Q    Do you have a 401-K with Weidmann?

17  A    Weidmann supplies a 401-K.

18  Q    And do you participate?

19  A    I don't --

20  Q    Okay.

21  A    -- I don't have money taken out. They

22  just have one.

23  Q    Do they contribute for you?

**Page 15**

1  A    $10,000.00.

2  Q    For --

3  A    My son.

4  Q    -- your son? And any for your wife?

5  A    No.

6  Q    Did you have life insurance -- similar

7  life insurance options available at MasterBrand?

8  A    Yes.

9  Q    Do you recall what life insurance you had

10  at MBCI? I'm sorry. At MasterBrand?

11  A    What --

12  Q    What life insurance coverage you

13  elected --

14  A    Amount?

15  Q    -- while at MasterBrand? Yes.

16  A    I'm not sure what the amount was.

17  Q    Are you covered by a short-term

18  disability policy at Weidmann?

19  A    Yes.

20  Q    Do you have to pay for that coverage?

21  A    No.

22  Q    Are you covered by a long-term disability

23  policy at Weidmann?

**Page 14**

1  A    Yes.

2  Q    Okay. So Weidmann contributes, but you

3  don't contribute personally; is that correct?

4  A    Right.

5  Q    If you wanted to, would you be able to

6  make contributions? Do you have the option of

7  making personal contributions?

8  A    I do have the option.

9  Q    Any other retirement-type benefits,

10  pension or anything else?

11  A    From Weidmann?

12  Q    Yes.

13  A    I'm not sure.

14  Q    Do you have life insurance there?

15  A    Yes.

16  Q    In what amount?

17  A    $50,000.00.

18  Q    How about for any of your dependents; do

19  they offer life insurance for your dependents?

20  A    They do.

21  Q    And have you elected any?

22  A    Yes.

23  Q    Okay. And what amount?

**Page 16**

1  A    Not to my knowledge.

2  Q    Any other benefits we haven't discussed

3  that are available to you at Weidmann?

4  A    Not that I know of.

5  Q    Okay. Presumably you have vacation time

6  through them?

7  A    Through Weidmann?

8  Q    Through Weidmann.

9  A    Yes.

10  Q    How much do you get per year?

11  A    Two weeks.

12  Q    Is that paid?

13  A    Yes.

14  Q    Okay. Let's talk a little bit about

15  Area Realty. How long have you been working for

16  Area Realty?

17  A    Approximately, three years and eleven

18  months.

19  Q    Have you worked with any other real

20  estate companies, other than Area Realty?

21  A    Yes.

22  Q    Tell me who else you've worked for.

23  A    Century 21.

4 (Pages 13 to 16)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 17

1 Q    In what city?
2 A    Opelika.
3 Q    When did you work for Century 21?
4 A    '98 to 2000.
5 Q    Is there more than one Century 21 office
6 in Opelika?
7 A    Not at any one time.
8 Q    Okay.  Do you recall the address for that
9 Century 21 office where you worked?
10 A    No.
11 Q    How long have you held a real estate
12 license?
13 A    Since 1998.
14 Q    What's your relationship with Area
15 Realty?  Are you an employee; are you an
16 independent contractor?
17 A    Independent contractor.
18 Q    Do you have any type of independent
19 contractor agreement with them?
20 A    Not that I know of, no.
21 Q    Okay.  How is your compensation set; how
22 does that work?
23 A    We work off of -- we get paid

Page 18

1 commissions.
2 Q    Are there any written documents that
3 describe how the commissions will be paid?
4 A    No.
5 Q    How do you know what the structure's
6 going to be?
7 A    I talk with the broker.
8 Q    All right.
9 A    We discussed that when she took me on.
10 Q    Who's the broker?
11 A    Iris Hendricks.
12 Q    What's your agreement with Ms. Hendricks
13 regarding commissions?
14 A    Sixty percent for selling an office
15 listing; fifty-five percent for selling any
16 other listing.
17 Q    I'm sorry.  Sixty percent for an office
18 listing, and what was the percent for any other?
19 A    Fifty-five.
20 Q    All right.
21 A    And that's initially.
22 Q    Okay.
23 A    It goes up.  Every time you make

Page 19

1 $10,000.00, it goes up five percent each.
2 Q    Is that your current agreement with Area
3 Realty?
4 A    Yes.
5 Q    Has it changed over the years?
6 A    No.
7 Q    No?
8 A    No.
9 Q    Okay.  Do you work full-time at Weidmann?
10 A    Yes.
11 Q    How many hours?
12 A    Forty.
13 Q    Do you get overtime?
14 A    No.
15 Q    How many hours per week would you say you
16 work in the real estate business?
17 A    I'd say approximately twenty-five.
18 Q    And that's twenty-five hours per week
19 currently for real estate-related items?
20 A    Yes.
21 Q    Let's go back to 2005 when you were still
22 at MasterBrand.  Roughly, how many hours per
23 week then would you say you were working in real

Page 20

1 estate?
2 A    About twenty-five.
3 Q    Okay.  What shift did you work at MBCI?
4 A    First.
5 Q    Do you have any benefits at all available
6 through Area Realty?
7 A    No.
8 Q    Do you have any agreements as to how many
9 hours per week you will work for Area Realty?
10 A    No.
11 Q    That twenty-five hours that you work per
12 week in real estate, can you describe for me
13 when you fit those hours in?
14 A    You're talking about right now,
15 currently?
16 Q    Yes.
17 A    Usually on weekends, I work -- usually I
18 wake up about -- well, it varies.  It's hard to
19 sleep in the daytime.  I wake up sometimes at
20 10:30, 11:00.  Then I start returning phone
21 calls and making showings.
22 Q    Okay.  Do you do any during the week?
23 A    Yes.

5 (Pages 17 to 20)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

| Page 21 | Page 23 |
|---|---|
| 1 Q Okay. | 1 Q What does she do for Wal-Mart? |
| 2 A That's not waking up on the weekends. I | 2 A She works as a customer service manager. |
| 3 don't work weekends at Weidmann. | 3 Q Let's go back to the time when you were |
| 4 Q Okay. | 4 employed at MBCI, and tell me how you fit your |
| 5 A That was during the week. | 5 real estate activities into the week. |
| 6 Q All right. | 6 A Well, the normal work hours were 5:00 to |
| 7 A I wake up about 11:00, 10:30 or 11:00, | 7 1:30. |
| 8 and begin doing real estate through the week. | 8 Q Is that 5:00 a.m. or 5:00 p.m.? |
| 9 Q I got you. Okay. So your forty hours | 9 A 5:00 a.m. |
| 10 that you work at Weidmann, what days of the week | 10 Q 5:00 a.m. to 1:30 p.m. was your regular |
| 11 is that? | 11 shift? |
| 12 A Well, they consider it Monday through | 12 A Yes. |
| 13 Friday even though you start work Sunday night | 13 Q Okay. Is that considered first shift? |
| 14 at 11:00. | 14 A Yes. |
| 15 Q Okay. So you do some real estate work | 15 Q Did you work overtime? |
| 16 during the week, as you've described for me. Do | 16 A Sometimes. |
| 17 you do any on the weekends, as well? | 17 Q What was your job title there? |
| 18 A Yes. | 18 A Material handler. |
| 19 Q Okay. Are you responsible for generating | 19 Q So you worked 5:00 to 1:30 at |
| 20 your own listings? | 20 MasterBrand, and then tell me when you would fit |
| 21 A Yes. | 21 in your real estate activities. |
| 22 Q If I wanted to see what listings you had, | 22 A I would start as soon as I got home from |
| 23 would that be in a newspaper somewhere in | 23 work. |

| Page 22 | Page 24 |
|---|---|
| 1 Opelika or Auburn? Where would I find those | 1 Q Okay. |
| 2 things? | 2 A I got off at 1:30. |
| 3 A At all of them. | 3 Q Now, I assume you have closings? |
| 4 Q Some of them; a sampling of them? | 4 A Yes. |
| 5 A The broker advertises on the weekends, | 5 Q And do you have to attend those closings? |
| 6 the Sunday paper. | 6 A I didn't attend all of them, no. |
| 7 Q Okay. Do you do any advertising | 7 Q Okay. About how many, on average, |
| 8 yourself? | 8 percentage-wise, of your closings would you say |
| 9 A Yes. | 9 you attend? |
| 10 Q Where do you advertise? | 10 A At that time? |
| 11 A Valley Times. I've done some in the | 11 Q Yes. |
| 12 Opelika area. | 12 A Ninety-five. |
| 13 Q What Sunday paper does the broker | 13 Q Ninety-five percent you would attend? |
| 14 advertise in? | 14 A Yeah. |
| 15 A Opelika and Auburn; Opelika/Auburn News. | 15 Q Where would the closings typically be |
| 16 Q Other than your work at Weidmann and for | 16 held at that time? |
| 17 Area Realty, do you have any other sources of | 17 A Usually at an attorney's office. |
| 18 income? | 18 Q Okay. |
| 19 A No. | 19 A Various -- |
| 20 Q Does your wife work? | 20 Q Does that depend on just the buyers and |
| 21 A Yes. | 21 sellers? |
| 22 Q Where does she work? | 22 A Right. |
| 23 A Wal-Mart. | 23 Q Okay. When did the closings typically |

6 (Pages 21 to 24)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 25

1  take place, in terms of time of day?
2  A    Most of them after lunch --
3  Q    All right.
4  A    -- afternoon.
5  Q    Did you keep any records of the closings
6  that you attended?
7  A    No.
8  Q    Did anyone, to your knowledge?
9  A    No.
10  Q    Are there any records that would reflect
11  the properties that you sold in 2005, for
12  example?
13  A    On the system, it's going to show some of
14  them, but --
15  Q    I'm sorry. What system?
16  A    MLS.
17  Q    I'm sorry?
18  A    MLS, Multiple Listings.
19  Q    I'm sorry. Did I interrupt you? Go
20  ahead.
21  A    Multiple Listings.
22  Q    Okay. Who maintains that Multiple
23  Listing service?

Page 26

1  A    The County Association of Realtors.
2  Q    And is that listing available to the
3  public?
4  A    What do you mean?
5  Q    If I wanted to see what properties you
6  sold in '05, would I be able to obtain that
7  information from MLS just as a member of the
8  public?
9  A    I'm not sure.
10  Q    Okay. Is that an internet-based service
11  or what is it?
12  A    It is internet-based.
13  Q    Okay. Any other place where you think
14  records would be maintained on the properties
15  that you sold in 2005?
16  A    Area Realty.
17  Q    Ms. Hendricks would have some of that
18  information, you think?
19  A    Yes.
20  Q    Okay. What type of records would Area
21  Realty maintain with respect to what you sold?
22  A    What kind of records?
23  Q    Yes.

Page 27

1  A    In the way of contracts and closing
2  documents --
3  Q    All right.
4  A    -- and disclosures.
5  Q    Were there any type of worksheets or
6  logs, for lack of a better word, that you kept
7  so that you could demonstrate what commissions
8  you were entitled to?
9  A    Did I keep a log?
10  Q    Yes.
11  A    No.
12  Q    Okay. Did Area Realty?
13  A    Yes.
14  Q    Okay. Tell me about that. I mean, I
15  guess I'm curious if you're out selling
16  properties and you're going to get a commission
17  on that, what type of documents are created so
18  that at the end of the day you and Ms. Hendricks
19  can sit down and say, "I'm owed 'X' amount of
20  dollars?"
21  A    I'm not sure of the name of the document.
22  She just keeps -- she has to keep up with
23  everything and she does.

Page 28

1  Q    Okay. What's the process, though? So if
2  you go out and you sell a property, what's the
3  process; how do you notify Area Realty and what
4  happens?
5  A    When it comes under contract, we put it
6  in -- as under contract or pending in MLS.
7  Q    All right.
8  A    And put the file in the pending files.
9  We either tell her or she sees them in the
10  pendings when she comes to the office.
11  Q    Okay. And can you describe for me,
12  although you might not know the name of it, what
13  type of document or list she maintains so that
14  she knows how much she owes each person?
15  A    I don't know the name.
16  Q    I know you don't know the name, but can
17  you -- is it a -- is it in the computer; is it a
18  big list; can you describe for me what it is?
19      BY MR. ARNOLD: Object to form.
20  A    I don't know if it's on a computer or
21  not. I just know that it's -- she keeps a list.
22  Q    (continued by Ms. Creveling) Okay. And
23  you trust her to keep that accurately?

7 (Pages 25 to 28)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 29

1      BY MR. ARNOLD: Object to form.
2   A    Yes.
3   Q    (continued by Ms. Creveling)  Okay.  Did
4   you ever miss time from work at MasterBrand to
5   deal with your real estate activities?
6   A    My own real estate.
7   Q    Meaning what?
8   A    I own real estate.  I had to leave.
9   Q    Okay.  What real estate do you own?
10  A    I own an interest in 2723 Edwards Road.
11  Q    I'm sorry.  Which road?
12  A    Edwards.
13  Q    Edwards Road?  What city is that in?
14  A    Opelika.
15  Q    What type of property is that?
16  A    A single family.
17  Q    And any other property that you own?
18  A    Besides where I live?
19  Q    Yes.
20  A    No.
21  Q    Okay.  So if I understand you, you would
22  have to miss work on occasion from MasterBrand
23  to deal with the Edwards Road property issues?

Page 30

1   A    Not on occasion.  It was this particular
2   time; something came up.
3   Q    Okay.  What particular time was that?
4   A    When the person that owned the other
5   interest -- well, some of the owners --
6   Q    Uh-huh.
7   A    -- it's their property -- they left junk
8   cars on that property, but their name didn't
9   show up, just mine; and I had to get it cleaned
10  up.
11  Q    Okay.  Roughly, when did that occur?
12  A    I think two years ago.
13  Q    Okay.  Let's see, that would put us in
14  '05 sometime?
15  A    Yes.
16  Q    Okay.  Do you remember what part of the
17  year in '05?
18  A    It was the second half of the year.
19  Q    Okay.  Anything that would allow you --
20  any documents you have that would allow you to
21  pinpoint when that was more specifically?
22  A    It may have been three years.
23  Q    Okay.

Page 31

1   A    I'm not -- I'm really not sure on those
2   years, but the other owner was supposed to buy
3   it, and I've been waiting and waiting.
4   Q    Anything that you have that would allow
5   you to pinpoint more precisely when that
6   occurred?
7   A    Anything that I have?
8   Q    Yeah.
9   A    No.
10  Q    When you say you had to clean it up, was
11  there any type of action by the City or any
12  formal action?
13  A    Yes, the City notified me that it needed
14  to be cleaned up.
15  Q    Is there a particular office or agency
16  from the City that notified you?
17  A    I don't know what the name of it was.
18  Q    Let's talk a little bit about your work
19  at MBCI.  I think you told me you were a
20  material handler at the time you were
21  terminated; is that right?
22  A    Yes.
23  Q    And you were on first shift?

Page 32

1   A    Yes.
2   Q    Who was your supervisor at the time of
3   your termination?
4   A    John Oleinick.
5   Q    Roughly, how long would you say Mr.
6   Oleinick had been your supervisor?
7   A    I'm not sure.
8   Q    Can you give me an approximation?
9   A    Approximately, two years.
10  Q    Okay.  What department were you in?
11  A    Door Warehouse.
12  Q    You were an hourly employee; is that
13  right?
14  A    Yes.
15  Q    Okay.  I think you told me -- what were
16  you making at the time you left, $12.50 an hour?
17  Oh, no, I'm sorry.  That's Weidmann.  Maybe we
18  didn't talk about that.  What were you making at
19  MBCI when you left?
20  A    $12.60.
21  Q    And I assume since you were on first
22  shift, there wasn't any type of shift
23  differential or any other money on top of that

8 (Pages 29 to 32)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 33

1  hourly rate?
2  A    No.
3  Q    Tell me how you kept track of your work
4  hours there.
5  A    What do you mean?
6  Q    Did you fill out a time card; was there a
7  time clock; how were your hours kept track of?
8  A    Time clock.
9  Q    Okay.  How did that system work?
10  A    You had a card that you clocked in with.
11  Q    And is the card like a big paper card or
12  is it more something that looks like a credit
13  card?
14  A    Like a credit card.
15  Q    Okay.  And walk me through the steps.
16  How did this thing work?
17  A    If I remember correctly, you just slide
18  it.
19  Q    Slide it down the side of the machine?
20  A    Yes.
21  Q    Okay.  And then what would the -- what
22  would the machine do; what did it tell you;
23  anything at that point?

Page 34

1  A    I think your name popped up.
2  Q    Okay.  There's some sort of screen on the
3  front of it?
4  A    Yes.
5  Q    Okay.  Did it beep at you or anything?
6  A    I think so.
7  Q    Okay.  Do you recall, did the system have
8  any particular name or did the machine have any
9  particular name?
10  A    It did.
11  Q    Do you remember what it was?
12  A    I don't.
13  Q    Okay.  I've heard of a couple of
14  different systems.  I'll just mention some, and
15  if you think it's one of them, let me know.
16  I've heard of, I think, Stripe Lightning or
17  Strike Lightning and Kronos.  Do either of those
18  sound familiar?
19  A    Kronos sounds familiar.
20  Q    Okay.  Ever have any problems clocking in
21  or clocking out?
22  A    I think so.
23  Q    Tell me about those.

Page 35

1  A    If I remember correctly, occasionally
2  when you would swipe it, nothing would happen.
3  Q    All right.
4  A    I don't think it happened too often.
5  Q    I'm sorry.  I didn't hear you.
6  A    I don't think it happened too often.
7  Q    Okay.  So if you swiped and nothing
8  happened, what would you do?
9  A    Just tell someone.
10  Q    Would you swipe it again?
11  A    Yes.
12  Q    Okay.  And if that didn't work, then you
13  would go tell somebody?
14  A    Uh-huh.
15  BY THE REPORTER:  Is that "yes?"
16  A    Yes.
17  Q    (continued by Ms. Creveling) You're doing
18  pretty good with that rule.  Most people forget
19  that in about ten seconds.  Who would you go
20  tell if the clock wasn't working?
21  A    Well, at that time, either Linda or
22  Gloria; just made sure that somebody knew.
23  Q    What position did Linda --

Page 36

1  A    And they see me there.
2  Q    So you would get paid, right?
3  A    Right.
4  Q    What position did Linda hold?
5  A    Linda holds support tech.
6  Q    Was she a Door Warehouse employee?
7  A    Yes.
8  Q    Okay.  Did she have supervisory-type
9  duties?
10  A    Yes.
11  Q    All right.
12  A    Light.
13  Q    Okay.  And how about Gloria, what
14  position did she hold?
15  A    A material handler.
16  Q    Also in Door Warehouse?
17  A    Yes.
18  Q    Okay.  Why not the supervisor?
19  A    The supervisor at 5:00 is not there
20  usually.
21  Q    Okay.  And on those few occasions when
22  the time clock didn't work and you had to go
23  tell somebody, did you ever have any problems

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

---

Page 37

1  with getting paid?
2  A    Problem as to --
3  Q    Not getting paid.
4  A    You're talking about right then on time
5  or later?
6  Q    Well, I guess I don't know how to answer
7  that. You clock in. How often were you getting
8  paid? Let's start there.
9  A    When you clock in?
10 Q    No. Were you getting paid every week or
11 every two weeks?
12 A    Every week.
13 Q    Every week. Okay. So let's say on a
14 Tuesday, you swiped and it didn't work and you
15 went and told Linda or Gloria. At the end of
16 that week, would you get properly paid for that
17 Tuesday even though the clock hadn't worked?
18 A    It's hard to remember, but I do remember
19 times that somebody had to get paid the next
20 week, because something didn't work.
21 Q    Okay.
22 A    But as with me, I don't remember not
23 getting paid.

---

Page 38

1  Q    Okay.
2  A    I don't remember.
3  Q    So would somebody then go into the system
4  and tell the clock or tell the system Mr. Giles
5  was here; is that how that worked?
6  A    Yes.
7  Q    Okay. And tell me about the company's
8  Attendance Policy. It's my understanding that a
9  new Attendance Policy went into effect in July
10 of 2005. Does that sound familiar to you?
11 A    Yes.
12 Q    Okay. Tell me about your understanding
13 of how the Attendance Policy worked.
14      BY MR. ARNOLD: Object to the form.
15 A    You got -- if you called in before your
16 schedule of work time and you had to be out, it
17 would be two points.
18 Q    (continued by Ms. Creveling) That's if
19 you're going to be absent for the whole day?
20 A    Yes.
21 Q    Okay. What about if you're going to be
22 late?
23 A    It depends on how late.

---

Page 39

1  Q    Okay.
2  A    If you're just a minute or up to two
3  hours, it's a half point.
4  Q    Okay. What about if you're late more
5  than two hours?
6  A    It's going to be one point.
7  Q    And what if you had to leave work early?
8  A    If it was two hours or less, a half
9  point.
10 Q    And if it was more than two hours?
11 A    One point.
12 Q    Were there any absences that were excused
13 under the policy?
14 A    Absences that were excused?
15 Q    Uh-huh. Where you wouldn't get points
16 even though you weren't at work.
17 A    If you had consecutive days and you had
18 vacation time.
19 Q    What would happen then?
20 A    Vacation time would be used and you
21 wouldn't get a point.
22 Q    Any other reasons why absences or tardies
23 or leave-earlies would be excused and you

---

Page 40

1  wouldn't get points?
2  A    Scheduled time off.
3  Q    What's scheduled time off?
4  A    MasterBrand, I think they gave eight
5  hours of scheduled time off.
6  Q    Is that eight hours per month or year or
7  how did it work?
8  A    Initially when they started, they gave
9  eight hours. And that was in July when they
10 changed the system, changed the --
11 Q    So that would be for the rest of that
12 year, then?
13 A    Yes.
14 Q    Okay.
15 A    And I think that fourteen hours were
16 given at the start of the next year for the
17 whole year.
18 Q    Okay. And so if you were not going to be
19 at work, you could use -- and you had it
20 available -- you could use scheduled time off
21 and you wouldn't get points?
22 A    Right.
23 Q    Okay. Any other excused-type absences

10 (Pages 37 to 40)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

---

Page 41

1   under the Attendance Policy?
2   A    I don't think so.
3   Q    Okay. What if you brought in a doctor's
4   note? Let's say you were sick for the day and
5   you brought in a doctor's note to show that you
6   had been sick for that day, would you still get
7   points for that day?
8   A    Yes.
9   Q    Okay.
10  A    Unless it was -- you're talking about
11  just for one day? For just one day, yes, you
12  would get a point.
13  Q    Okay. What if it was more days than
14  that?
15  A    For consecutive days, if you had
16  scheduled time off or vacation time, you can
17  use -- I mean, if you have scheduled time off or
18  vacation time on consecutive days, they use the
19  vacation days.
20  Q    And what if you didn't?
21  A    If you didn't, you got points.
22  Q    Okay. So let's say you were off for two
23  days, would you get two points for the first day

---

Page 42

1   and two points for the second day?
2   A    Well --
3   Q    If you didn't have vacation or scheduled
4   time.
5   A    Yes.
6   Q    Okay. In your opinion, was the
7   Attendance Policy applied equally to everyone?
8       BY MR. ARNOLD: Object to form.
9   A    I don't know.
10  Q    (continued by Ms. Creveling) I'm sorry?
11  A    I don't know if it was applied equally to
12  everyone.
13  Q    Okay. Are you aware of any instances
14  where people were allowed to be absent from work
15  and not incur points?
16  A    I don't know.
17  Q    Okay.
18
19  REPORTER'S NOTE: (At this point, instrument was
20  marked for identification by the Reporter as
21  Defendant's Exhibit Number 1, after which, the
22  deposition continued, as follows:)
23

---

Page 43

1   Q    (continued by Ms. Creveling) I'm going
2   to hand you what we've marked as Defendant's
3   Exhibit 1 and have you take a look at that for
4   me, please, and let me know when you're done.
5       BY MR. ARNOLD: Since you all didn't use
6   Bates labels, Kelly, would you just verify -- or
7   just put on the record what tab these might have
8   been under, if you can recall, for purposes --
9   because that's kind of how we've kept track of
10  it.
11      BY MS. CREVELING: I can't recall.
12      BY MR. ARNOLD: Okay.
13      BY MS. CREVELING: I think we've provided
14  them with our initial disclosures, and because
15  of that, we didn't attach them to the discovery.
16  That's my recollection. I think we just said we
17  had previously produced it.
18  Q    (continued by Ms. Creveling) Have you
19  had a chance to get through Exhibit 1?
20  A    Yes.
21  Q    Okay. Let's look at the first page,
22  please. Is that your signature on that
23  document?

---

Page 44

1   A    Yes.
2   Q    Okay. And is the attached policy the
3   Attendance Policy that went into effect in July
4   of 2005 that we've discussed?
5   A    Yes.
6   Q    Okay. Let's look at the first page of
7   the Attendance Policy under the heading
8   "Reporting An Absence."
9   A    Okay.
10  Q    This section of the policy indicates that
11  employees who are going to be absent from work
12  must call in and leave a message at a particular
13  number. Is that your recollection of the actual
14  practice that was in place?
15  A    Yes.
16  Q    Okay. And on occasion, you had reason to
17  call in; is that right?
18  A    Yes.
19  Q    Okay. And tell me about that process.
20  You would call in, and was it a recording? How
21  did that work?
22  A    It was a recording.
23  Q    And what happened with that recording; do

---

11 (Pages 41 to 44)

Page 45

1  you know?
2  A    What do you mean what happened with it?
3  Q    You called in; you left a message on the
4  recording.  Do you know who retrieved those
5  messages?
6  A    No.
7  Q    Okay.  Do you know who those messages
8  were provided to?
9  A    They're supposed to be supplied to the
10  supervisor.
11  Q    Okay.  Let's take a look at the second
12  page of the Attendance Policy.  Under the
13  heading of "Related Consecutive Absences," this
14  indicates that if an employee misses consecutive
15  work days due to their own medical condition,
16  they will get, as I understand it, two points
17  for the first day and one point for the second
18  day.  Do you see that?
19  A    Yes.
20  Q    Okay.  Is that your understanding of what
21  the practice was?
22  A    Except when you have vacation hours or
23  scheduled time off.

Page 46

1  Q    Okay.  I think this indicates that that
2  happens so long as the employee has exhausted
3  their scheduled time off and their vacation.
4  A    Okay.
5  Q    Do you agree with that?  So if someone
6  has exhausted their vacation time and their
7  scheduled time and they're out consecutive days
8  for their medical condition, they'll get two
9  points for the first day and one point for the
10  second day?
11  A    Yes.
12  Q    Okay.  And was that the practice of the
13  company when you were there?
14  A    Yes.
15  Q    Okay.  Let's talk a little bit about what
16  would happen if an employee violated the
17  Attendance Policy.  On page 3 of the Attendance
18  Policy there's a heading called "Disciplinary
19  Action."  It talks about warnings that would
20  occur.  Did you receive any warnings under the
21  Attendance Policy?
22  A    No.
23  Q    Do you recall receiving a verbal warning

Page 47

1  for your attendance?
2  A    No.
3  Q    Okay.  If your supervisor recalled
4  issuing a verbal warning, would you have reason
5  to disagree with that?
6  A    Yes.
7  Q    Why?
8  A    Because I did not get a verbal warning.
9  Q    Is it that you did not get one or you
10  don't remember getting one?
11  A    I did not get one.
12  Q    Okay.  Did you get a verbal warning for
13  anything else?
14  A    No.
15  Q    Okay.  Any idea how verbal warnings were
16  issued by Mr. Oleinick?
17  A    Just what I heard from other people.
18  Q    Okay.  No experience with that yourself?
19  A    No.
20  Q    Okay.  Let's talk a little bit about
21  events in December of 2005.  It's my
22  understanding that you requested a leave of
23  absence in December of 2005; is that accurate?

Page 48

1  A    No.
2  Q    No?
3  A    No, I did not request it.
4  BY MR. ARNOLD:  Before we get into this,
5  can I ask the relevance, since it's admitted by
6  the Defendant that at least for the absence of
7  December 19th through January 2nd, '06, uh, just
8  why we need to get into it since it's --
9  BY MS. CREVELING:  I'm not going to get
10  into a whole lot of detail on it.
11  BY MR. ARNOLD:  Okay.
12  BY MS. CREVELING:  I'm going to talk a
13  little bit more about process.
14  BY MR. ARNOLD:  Okay; that's fine.
15  Q    (continued by Ms. Creveling)  You were
16  granted a leave of absence in December of '05;
17  is that right?
18  A    Yes.
19  Q    Okay.  Tell me what type of process you
20  went through in order to obtain a leave.  What
21  was the company's procedure to get a leave of
22  absence?
23  A    I just know what happened with me.

12 (Pages 45 to 48)

Page 49

1  Q    Okay.  Tell me about that.
2  A    I went to the doctor and he said I needed
3  to be on light duty, and I gave it to my
4  supervisor.  Then I got called to the office,
5  and they put these papers down in front of me
6  and told me to fill them out, and I filled them
7  out and was sent home.
8  Q    Did you have any problem with that
9  process?
10 A    No.
11 Q    In December of '05, did you get all of
12 the leave that you needed?
13 A    Do you mean all that the doctor --
14 Q    Said that you needed?
15 A    Well, he didn't say, "Leave;" he said,
16 "Light duty."
17 Q    Okay.  Well, we've established that you
18 got a leave of absence in December of '05.  Are
19 you telling me you didn't need it?
20      BY MR. ARNOLD:  Object to form.
21 A    The doctor said to be on light duty.
22 Q    (continued by Ms. Creveling)  Okay.
23 A    But MasterBrand sends you home.

Page 50

1  Q    Okay.  They couldn't accommodate the
2  light duty?
3       BY MR. ARNOLD:  Object to form.
4  A    I just know they sent me home.  They
5  don't say what they -- what did you just say?
6  Q    (continued by Ms. Creveling)  They
7  wouldn't accommodate the light duty?
8  A    They don't say they accommodate it or
9  not.  They just send you home.
10 Q    Okay.  So you don't know why the doctor
11 said light duty?  You don't know why you were
12 given a leave of absence, but you were given a
13 leave of absence; is that what I'm to
14 understand?
15 A    Well, the job requires that you be able
16 to lift fifty to seventy-five pounds.
17 Q    Okay.  And what were your restrictions at
18 that time?
19 A    I think it was about ten or fifteen
20 pounds.
21 Q    Okay.  So your restrictions were
22 inconsistent with the job duties that you had?
23 A    Yes.

Page 51

1  Q    And MasterBrand sent you home and put you
2  on a leave of absence?
3  A    Yes.
4  Q    Okay.  And for the time that you were on
5  that leave of absence, did you get any points
6  under the Attendance Policy?
7  A    No.
8  Q    Okay.  The company's records indicate
9  that you came back to work on January 3 of 2006.
10 Would you have any reason to dispute that?
11 A    Was that a Monday?  I'm not sure.
12 Q    I don't know.  Let me look.
13 A    Or was that a Tuesday?
14 A    It was a Tuesday.
15 A    What was the question?
16 Q    If the company's records show that you
17 returned to work from that leave of absence on
18 January 3, 2006, would you have any reason to
19 dispute that?
20 A    No.
21 Q    Okay.  Anything happen when you came back
22 to work; did that go okay?
23      BY MR. ARNOLD:  Object to the form.

Page 52

1  A    Yes.
2  Q    (continued by Ms. Creveling)  What
3  happened when you came back to work?
4  A    Repeat that question.
5  Q    Did anything unusual happen when you came
6  back to work?
7  A    Oh.  No.  I'm sorry.
8  Q    Then as I understand it on January 4th,
9  you worked a little better than two hours and
10 then went home.
11 A    Yes.
12 Q    Is that accurate?
13 A    Yes.
14 Q    Okay.  Let's go ahead and mark this.
15
16 REPORTER'S NOTE:  (At this point, instrument was
17 marked for identification by the Reporter as
18 Defendant's Exhibit Number 2, after which, the
19 deposition continued, as follows:)
20
21 Q    (continued by Ms. Creveling)  I'll hand
22 you what we've marked as Defendant's Exhibit 2,
23 which is a punch detail history of your time

13 (Pages 49 to 52)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 53

1  from January 1, '05 through June 1 of '06. And
2  if you'll look on the last page of that exhibit,
3  it shows for January 4, 2006 that you clocked in
4  at 4:56 a.m. and clocked out at 7:10 a.m. Do
5  you see that? It's under the "actual" column.
6  There's the date on the far left, and then about
7  three columns over maybe there's "actual."
8      BY MR. ARNOLD: May I?
9      BY MS. CREVELING: Sure.
10 A    4:56.
11 Q    (continued by Ms. Creveling) And out at
12 7:10; do you see that?
13 A    Yes.
14 Q    Okay. Any reason to disagree with the
15 time there as recorded by the time clock?
16 A    No.
17 Q    Okay. For what reason did you leave work
18 early on January 4th?
19 A    I was sick.
20 Q    Let's go back to December of '05 for just
21 a moment. The company's records show that you
22 were out due to some sort of shoulder injury; is
23 that right?

Page 54

1  A    You're going back to what?
2  Q    In December of 2005, you were out for
3  some sort of shoulder problem; is that right?
4  A    Yes.
5  Q    Okay. And then your absence -- or
6  your -- your leave early on January 4, you said
7  you were sick. So that's not related to your
8  shoulder; is that correct?
9  A    Right.
10 Q    Okay. Did you talk to anyone at
11 MasterBrand before you left early on January 4?
12 A    Yes.
13 Q    Tell me who you spoke with.
14 A    John Oleinick.
15 Q    As best you can, repeat for me that
16 conversation.
17 A    I told John I was sick, and he came back
18 and said, "Are you leaving or staying?" And I
19 said, "I'm leaving." And he said, "And we're in
20 the same fix as we were before."
21 Q    And when he said, "We're in the same fix
22 as before," what did you understand that to
23 mean?

Page 55

1  A    When I was out on leave.
2  Q    In December of '05?
3  A    Yes. They had to try to find somebody to
4  do the job that I did again, like they did when
5  I was on leave.
6  Q    And was that a problem to find somebody
7  to do your job while you were out on leave?
8      BY MR. ARNOLD: Object to form.
9  A    Yes.
10 Q    (continued by Ms. Creveling) Tell me
11 about that.
12 A    Tell you about --
13 Q    What was the problem?
14 A    Well, I can tell you that when that other
15 person that did my job was out, I know there was
16 always a problem trying to get somebody to fill
17 in for him.
18 Q    How many material handlers were there in
19 the Door Warehouse on first shift?
20 A    I'm not sure.
21 Q    Roughly?
22 A    Just in the doors? I would say twelve or
23 thirteen, I think.

Page 56

1  Q    And that's just on first shift; is that
2  right?
3  A    Yes.
4  Q    Were you all doing basically the same
5  thing?
6  A    Basically. But you pull orders, you have
7  doors, you have trim. I worked in the trim
8  area.
9  Q    I guess give me a quick explanation of
10 what a material handler does.
11 A    They get an order of what material is
12 needed to be pulled. They pull the order, put
13 it on a cart, send it to the next department.
14 Q    Was this material that the assemblers
15 needed in order to make the cabinets?
16 A    Yes.
17 Q    Okay. As I understand it, there are two
18 areas in Door Warehouse, the trim area and the
19 door area?
20 A    Yes.
21 Q    Roughly, how many material handlers on
22 first shift worked with you in the trim area?
23 A    Usually one other person, besides me.

14 (Pages 53 to 56)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 57

1  Q    Who was that?
2  A    That was Terry.
3  Q    Do you remember his last name?
4  A    No.
5  Q    So all of the remaining twelve to
6  thirteen material handlers worked over in Doors?
7  A    Yes.
8  Q    When you were on your leave of absence in
9  December of '05, to your knowledge, was Terry at
10  work during that period?
11  A    To my knowledge, he was.
12  Q    Okay. Do you know who filled in for you
13  while you were on your leave in December of '05?
14      BY MR. ARNOLD: Objection, relevance.
15  A    Just -- the only way I can know that,
16  since I wasn't there, I just heard it from
17  somebody.
18  Q    (continued by Ms. Creveling) Right. I
19  understand that. What did you hear?
20  A    I heard that Tracy did some and John
21  Oleinick did some.
22  Q    Do you know Tracy's last name?
23  A    Moncus.

Page 58

1  Q    Do you know how to spell that?
2  A    M-O-N-C-U-S.
3  Q    And the supervisor did some of the work,
4  too, from what you heard?
5  A    From what I heard.
6  Q    Okay. Anybody else that you heard was
7  filling in for you during December of '05?
8  A    Not that I know of.
9  Q    Okay. Did you ever talk to Tracy about
10  what happened while you were out on your leave
11  in December of '05?
12  A    Yeah; yes.
13  Q    Okay. Tell me what Tracy said.
14  A    I really can't remember exactly what he
15  said.
16  Q    What's the gist of the conversation?
17  A    Just that they were working on -- I guess
18  the length of time, about ten hours each.
19  Q    So according to Tracy, the department was
20  scheduled for overtime while you were out?
21  A    Yes.
22  Q    Okay. Anything else?
23  A    No.

Page 59

1  Q    Did you ever talk to John Oleinick about
2  what happened while you were out in December of
3  '05?
4  A    No.
5  Q    Okay. Did John ever make any comments to
6  you about -- or any other comments, other than,
7  "We're in the same fix as before," that you've
8  already told me about, any other comments about
9  you being off work in December of '05?
10  A    Not that I remember.
11  Q    Okay. Do you recall a time when you are
12  at work, but Terry had to be off work?
13  A    Yes.
14  Q    Okay. And what do you recall about who
15  filled in for Terry when Terry was gone?
16  A    Some days, nobody.
17  Q    And some days somebody would fill in?
18  A    Yes.
19  Q    Do you recall who filled in?
20  A    John Oleinick. At times, Rhonda. I
21  think that's about it.
22  Q    Do you remember Rhonda's last name?
23  A    McKemie.

Page 60

1  Q    McKemie?
2  A    Uh-huh.
3      BY THE REPORTER: How do you spell that?
4      THE WITNESS: M-C-K-E-M-I-E, I think.
5  Q    (continued by Ms. Creveling) On the days
6  when nobody filled in, did Terry's work just not
7  get done?
8  A    I had to do it.
9  Q    All right.
10  A    As much as I could.
11  Q    And do you know whether Terry did the
12  same for you when you were out?
13  A    I do know he didn't.
14  Q    Do you know why?
15  A    He had help. He had someone every day to
16  help him.
17  Q    Okay. So when you were out in December
18  of '05, Terry didn't have to pick up any of your
19  duties, because there was somebody else filling
20  in for you?
21  A    Yes.
22  Q    Okay. Do you have any concerns or do you
23  think that's unusual that you recall a time when

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

MERRILL LEGAL SOLUTIONS
**Court Reporting * Legal Videography * Trial Services**

Page 61

```
1   Terry was off and there was nobody to fill in,
2   but when you were off, there was somebody to
3   fill in?
4   A    What's the question?
5   Q    I understand there's a difference. You
6   recall a time when Terry was off and you had to
7   pick up his duties sometimes. When you were off
8   in December of '05, in contrast, there were
9   people to fill in for you. Is that okay with
10  you? Do you attribute any problems to that?
11       BY MR. ARNOLD: Object to form.
12  A    Do I attribute any problems to it?
13  Q    (continued by Ms. Creveling) Are you
14  suspicious of that, I guess is my question?
15       BY MR. ARNOLD: Object to form.
16  A    I don't understand it; I didn't
17  understand it.
18  Q    (continued by Ms. Creveling) Okay.
19  Terry's off work, and you tell me there are days
20  when you have to fill in for him.
21  A    Uh-huh; yes.
22  Q    Does it upset you at all that on days
23  when Terry was off you had to fill in for him?
```

Page 63

```
1   Q    Okay. Are you asserting in this lawsuit
2   that John was angry with you for taking leave
3   and therefore he would make you -- he would fail
4   to assign people to cover absences of other
5   employees so that you would have more work?
6        BY MR. ARNOLD: Object to form.
7   A    Actually from December to January, that
8   didn't happen. It happened before.
9   Q    (continued by Ms. Creveling) Okay.
10  A    And on one occasion, his support tech --
11  I told the support tech.
12  Q    Told the support tech what?
13  A    That John said he was going to leave me
14  over there to do all the work when Terry was out
15  on this particular time.
16  Q    Uh-huh.
17  A    And I told her and she got me some help
18  the first time.
19  Q    Okay. Other than your leave in December
20  of '05, had you had any other leaves of absence?
21  A    No, not that I remember.
22  Q    Okay. So if there was a time, prior to
23  December of '05, where Terry was absent and you
```

Page 62

```
1        BY MR. ARNOLD: Object to form.
2   A    Doing basically all the work, yes.
3   Q    (continued by Ms. Creveling) Okay. And
4   it's your understanding that while you were off,
5   Terry didn't have to fill in for you, because
6   somebody was assigned to cover for you, right?
7   A    Yes.
8   Q    Okay. Do you think the company did that
9   to you on purpose?
10  A    I don't know if the company knew about
11  it. I know John Oleinick knew about it.
12  Q    Okay. Do you think John did that on
13  purpose?
14  A    Yes.
15  Q    Why? Why do you think that?
16  A    I don't know.
17  Q    Well, tell me what you think John was
18  motivated by.
19  A    I don't know what motivated him.
20  Q    I'm not asking you what, in fact,
21  motivated him, but what do you suspect motivated
22  him?
23  A    I really don't know.
```

Page 64

```
1   were forced to cover for him or do his job
2   duties in addition to your own, clearly that
3   would have nothing to do with your leave in
4   December of '05?
5   A    It's hard to say, because you're doing
6   more work and working longer hours. It wears
7   down your body.
8   Q    Oh, I understand that. But in terms of
9   the reasons why John may or may not have been
10  assigning people to help you when another
11  employee was out didn't have anything to do with
12  your leave in December of '05?
13  A    I don't understand what you mean.
14  Q    Okay. Let's go back -- I sense from you
15  that you're suspicious of John Oleinick
16  because -- or that you're unhappy with John
17  Oleinick, because when Terry was out, you had no
18  help, but when you were out, Terry got help.
19       BY MR. ARNOLD: Objection.
20  Q    (continued by Ms. Creveling) Is that a
21  fair understanding on my part of how you feel
22  about the situation?
23       BY MR. ARNOLD: Object to the form.
```

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 65

1   A     That I was upset?
2   Q     (continued by Ms. Creveling) Yes.
3   A     I was upset.
4   Q     Okay. Explain for me why that situation
5   upset you.
6   A     Because there was a lot of work to do.
7   Q     Okay. I understand that when one
8   employee is out and the other employee has to
9   cover for them, that's a strain on the employee
10  who's at work, because they just obviously have
11  a lot more work to do. What I now need to
12  understand is whether you think John was doing
13  that to you on purpose; leaving you to cover for
14  an absent employee?
15  A     Whether I think it was on purpose?
16  Q     Yes.
17  A     Yes.
18  Q     Okay.
19        BY MR. ARNOLD: I would like to know the
20  relevance of this line of questioning.
21        BY MS. CREVELING: We've got a
22  retaliation claim on our hands here.
23        BY MR. ARNOLD: Correct.

Page 66

1         BY MS. CREVELING: And he is alleging
2   that John Oleinick, in essence, is the prime
3   character in that retaliation claim. So I'm
4   trying to understand why it is that he believes
5   John retaliated against him; what motivated John
6   to retaliate against him and on what occasions
7   he believed John retaliated again him. So I
8   understand so far that he's upset with having to
9   cover other employees' duties, for example, and
10  that he thinks John did that to him on purpose.
11  I'm now trying to understand what he thinks
12  motivated John in doing that.
13        BY MR. ARNOLD: Well --
14        BY MS. CREVELING: And whether or not
15  that's related to his leave. And so far, we
16  haven't been able to understand that.
17        BY MR. ARNOLD: Okay. I guess I'm not
18  understanding how you're even coming close to
19  making that relevant. What's relevant is the
20  leave, and you're -- I guess what -- are you
21  saying he was terminated for an at-will -- I
22  guess what I'm trying to figure out, I don't
23  even understand where you're going here even for

Page 67

1   an affirmative defense you're trying to prove.
2         BY MS. CREVELING: I'm not trying to
3   prove an affirmative defense right now. I'm
4   trying to get his understanding of his
5   relationship with his supervisor and what he
6   thinks motivated his supervisor; whether it was
7   something impermissible and illegal or not. I
8   think that's relevant entirely to a retaliation
9   claim that points directly at the supervisor's
10  conduct.
11  Q     (continued by Ms. Creveling) How would
12  you describe your relationship with Mr.
13  Oleinick?
14  A     I don't know what you mean. Are we close
15  friends?
16  Q     You tell me.
17  A     No.
18  Q     Okay. Did you respect one another?
19  A     Yes.
20  Q     Okay. It's my understanding in this
21  lawsuit that you allege that you were retaliated
22  against; that things happened to you at work
23  because you took a leave of absence. Do I

Page 68

1   understand that correctly?
2   A     Yes.
3   Q     Okay. Why -- well, let me ask you this.
4   Let's back up. Who specifically at MasterBrand
5   do you believe retaliated against you?
6   A     John Oleinick.
7   Q     Anyone else?
8   A     That's who I was working directly with.
9   Q     Okay. Do you believe anybody else
10  retaliated against you for taking leave in
11  December of '05?
12  A     I don't know.
13  Q     Describe for me all of the ways in which
14  you believe John Oleinick retaliated against you
15  for having taken leave in December of '05.
16  A     When I got sick, he made the statement
17  that I said earlier, "We're in the same fix as
18  we were before," and I was not allowed to use my
19  vacation time when I was out sick, and I had
20  consecutive days as according to the Attendance
21  Policy.
22  Q     The statement you're referring to is the
23  one where he says, "We're in the same fix as

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 69

1  before?"
2  A    Yes.
3  Q    Okay.  How much vacation time do you
4  believe you had available to you on January 4?
5  A    I had eighty hours.
6  Q    And what amount of scheduled time off, if
7  any, did you have available to you on January 4,
8  2006?
9  A    I'm not sure.
10  Q    How did the vacation time work?  When did
11  you get vacation time; when was it allotted to
12  you, so-to-speak?
13  A    At the beginning of the year.
14  Q    So on January 1, 2006, how many vacation
15  hours were you given?
16  A    Eighty.
17  Q    You didn't take any vacation time at
18  all -- well, I guess by January 4, you wouldn't
19  have taken any vacation time at that point.
20  A    No.
21  Q    Okay.  What was the policy on providing
22  notice of use of vacation?  Did you have to
23  give, for example, like at least twenty-four

Page 70

1  hours notice or anything of that nature?
2  A    For vacation; when you go on vacation?
3  Q    Right.  Or if you want to use any
4  vacation time, do you have to give advance
5  notice in order to do that?
6  A    If you're going to take a vacation day,
7  yeah.
8  Q    Okay.  How much advance notice would you
9  have to give?
10  A    The day before.
11  Q    Okay.  And does it have to be approved by
12  anyone?
13  A    Yes.
14  Q    Who?
15  A    Your supervisor.
16  Q    And do you know what criteria supervisors
17  were supposed to use in deciding whether or not
18  to approve a vacation day?
19  A    Up until a certain month -- and I don't
20  remember the month --
21  Q    Uh-huh.
22  A    -- it's -- it's seniority, and then after
23  that, it's first-come, first-serve.

Page 71

1  Q    So for a certain portion of the year use
2  of vacation is allowed on a seniority basis; and
3  after that, it's just first-come, first-serve?
4  A    Yes.
5  Q    Okay.  Now, let's talk about how those
6  notice provisions for use of vacation fit in
7  with the Attendance Policy.  On January 4 when
8  you leave sick, obviously you wouldn't have been
9  able to give a day's notice that you wanted to
10  use vacation time to cover January 4, the rest
11  of that day.  How did that work; how was that
12  supposed to work?
13  A    You're talking about January 4?
14  Q    Yes.  Do you believe you should have been
15  able to use a vacation day for the time you
16  missed on January 4?
17  A    No.
18  Q    Okay.  So how many points do you believe
19  you should have received for January 4?
20  A    One.
21  Q    Do you know how many points you got for
22  January 4?
23  A    As far as I know, one.

Page 72

1  Q    All right.
2  A    You mean what MasterBrand gave me?
3  Q    Yes.
4  A    One.
5  Q    So we have no dispute with how that day
6  was handled; is that right?
7  A    Right.
8  Q    Okay.  And then let's look back at
9  Exhibit 2.  You were absent for the entire day
10  on January 5; is that right?
11  A    Yes.
12  Q    Do you believe you should have been
13  allowed to use vacation time for your absence on
14  January 5?
15  A    Yes.
16  Q    Why?
17  A    It was a consecutive day of missed work
18  time.
19  Q    Did you make a request to use vacation
20  time for that day?
21  A    No.
22  Q    Then how would anybody know that you
23  wanted to use that as vacation?

18 (Pages 69 to 72)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 73

1  A    The company policy says that we can use
2  vacation time.
3  Q    Okay.
4  A    Well, not that we can use it. It says
5  that it will be used.
6  Q    Okay. Tell me what part of the
7  Attendance Policy you're referring to.
8  A    "Related Consecutive Absences."
9  Q    Uh-huh.
10 A    And the example.
11 Q    Okay. Can you point to me more
12 specifically where it says that the vacation
13 time's going to -- use of vacation time's going
14 to be automatic?
15 A    "An employee shall only be entitled to
16 this reduced point schedule provided the
17 employee timely reports each day's absence on
18 the Absence Line and the employee has exhausted
19 all Scheduled Time Off and vacation," which I
20 had not.
21 Q    Right. So you had not. And you told me
22 that your situation is the opposite, right? You
23 called off work for that day and you had

Page 74

1  vacation time available, correct?
2  A    Yes.
3  Q    And it's my understanding that you told
4  that you believe that your vacation time would
5  have just been automatically. I'm asking you to
6  point to me in the policy where it indicates
7  that for people who had vacation time available,
8  you didn't have to give notice; it would just
9  been taken automatically.
10 A    In the policy, I didn't read where it
11 said you had to give notice when you were out
12 sick.
13 Q    So the vacation policy says you must give
14 notice if you want to take a vacation day; is
15 that right?
16 A    Actually, is there a vacation policy in
17 here, because --
18 Q    No. The vacation policy would be a
19 separate policy.
20 A    Okay.
21 Q    But you've told me, as I understand it,
22 that the procedure was, you had to give notice
23 the day before if you wanted to use vacation

Page 75

1  time, right?
2  A    Yes.
3  Q    Okay.
4  A    But --
5  Q    Were there exceptions, to your
6  understanding, to that policy or procedure, that
7  notice provision?
8  A    Actually, there were.
9  Q    Okay. Tell me about those exceptions.
10 A    I don't know the particular time, but
11 there have been times where you call in and got
12 a vacation day the same day.
13 Q    Okay. Did you do that?
14 A    No. I was sick.
15 Q    Okay. Do you know -- can you give me
16 names of people who were allowed to call in and
17 take a vacation day on the same day?
18 A    I can't.
19 Q    I'm sorry. You cannot?
20 A    No.
21 Q    Okay. Why do you believe that was
22 occurring, if you're unable to name the person
23 who was allowed to do that?

Page 76

1  A    I'm trying to remember it all. I'm
2  not -- repeat that question.
3  Q    Sure. Why is it that you believe that
4  others were allowed to call in and obtain a
5  vacation on the same day if you don't know who
6  was allowed to do that? What makes you think
7  that was going on if you don't actually know
8  anybody who that happened to?
9  A    I just can't remember the person who knew
10 it was going on at sometime.
11 Q    Okay. Are there any other exceptions to
12 that notice provision of the Vacation Policy
13 that you believe were allowed?
14 A    What do you mean?
15 Q    You have to give notice the day before
16 that you're going to use a vacation day, and
17 you've told me you think there were exceptions
18 to that policy.
19 A    Besides consecutive days.
20 Q    All right.
21 A    Consecutive absences.
22 Q    Okay. So you think consecutive absences
23 were an exception to the notice provision in the

19 (Pages 73 to 76)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 77

1  Vacation Policy?
2  A    Yes.
3  Q    Okay. And tell me how you believe that
4  exception worked.
5  A    I believe it worked like it said here,
6  that when vacation time -- when you had vacation
7  time, that it wouldn't be counted against you on
8  consecutive absences until all of your vacation
9  time was exhausted.
10  Q    And so a person who was absent for
11  consecutive days and who had vacation time
12  available didn't need to tell anybody they
13  wanted to use vacation; it would just
14  automatically be taken; is that your
15  understanding of how that exception worked?
16  A    Yes.
17  Q    Okay. Can you identify any employees who
18  were absent when they had vacation time and the
19  company automatically used their vacation time
20  to cover their absences?
21  A    I don't know.
22  Q    Why do you believe that that exception
23  existed?

Page 78

1  A    Why do I believe they put it in there?
2  Q    I guess I'm trying to understand what
3  leads you to believe that use of vacation time
4  was automatic for consecutive absences.
5  A    Well, the only thing it says, if you have
6  a timely report of absence --
7  Q    Right.
8  A    -- that you have -- you call the Absence
9  Line in time and the employee has exhausted all
10  scheduled time off, which I have, it will be
11  used.
12  Q    Right. I mean, this portion that you're
13  referring to in the Attendance Policy says that
14  if you don't have vacation time available to you
15  and you're absent on consecutive days, the first
16  day's two points; the second day will only be
17  one point.
18  A    Unless you have vacation time, and then
19  vacation hours will be used.
20  Q    Okay. And so from this paragraph, the
21  related consecutive absences, you understand
22  that use of vacation, if you have it, is just
23  automatic?

Page 79

1  A    Well, I guess you figure that your
2  supervisor or personnel manager would discuss it
3  with you.
4  Q    And you wouldn't have to tell them that
5  you wanted to use vacation?
6  A    Of course, you would want to use it if
7  you didn't want to get fired.
8  Q    So it's your belief that John Oleinick
9  had a duty to ask you if you wanted to use
10  vacation time to cover your absence on January
11  5?
12      BY MR. ARNOLD:  Object to form.
13  A    He wouldn't have to ask me, but he -- I
14  was fired before I got back. Since my
15  attendance was in good standing obviously,
16  because there was no verbal or written warnings.
17  Q    (continued by Ms. Creveling) Any other
18  exceptions that you believe existed to that
19  notice provision of the Vacation Policy?
20  A    Besides vacation and scheduled time off?
21  Q    Besides calling in the same day to take
22  vacation and consecutive absences?
23  A    No.

Page 80

1  Q    Okay. Are you aware of any other
2  employees supervised by Mr. Oleinick who had
3  consecutive absences and Mr. Oleinick
4  automatically took their vacation time?
5  A    I didn't know of anybody that -- I didn't
6  know of anybody's information about what they
7  did when there were consecutive days.
8  Q    Okay. How about any other supervisors?
9  Are you aware of the practices of any other
10  supervisors, besides Mr. Oleinick, and whether
11  or not they would automatically take an
12  employee's vacation?
13  A    I didn't know. I don't know what they
14  do.
15  Q    Okay.
16      BY MS. CREVELING:  Let's take a break at
17  this point.
18
19  REPORTER'S NOTE:  (At this point, a brief recess
20  was taken, after which, the deposition
21  continued, as follows:)
22
23  Q    (continued by Ms. Creveling) I think

20 (Pages 77 to 80)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 81

1  right before we went on our break, we had gone
2  through all of the exceptions that you believe
3  existed to that notice provision in the Vacation
4  Policy.
5        BY MR. ARNOLD:  Actually, let's go on the
6  record right now.  I've looked through what I
7  believe you provided.  If you all are going to
8  rely on the Vacation Policy as a defense, I
9  think that should be provided.  It's not in our
10  initial disclosures.
11       BY MS. CREVELING:  And that's fine.
12  We'll be happy to do that.  Until today, we
13  weren't really aware that the Vacation Policy
14  might potentially come into play here.  So we'll
15  certainly do that.
16  Q    (continued by Ms. Creveling)  And so as I
17  understand it, you believe there are the two
18  exceptions to the notice provision; that some
19  folks could call in on the same day and use
20  vacation for that same day, and then the
21  consecutive absences were the two exceptions?
22  A    Yes.
23  Q    And those were the only two exceptions,

Page 82

1  as far as you know?
2  A    As far as I know.
3  Q    Okay.  And let's see here.  I think you
4  mentioned, right before we went on break, your
5  attendance record.  Let's walk through that a
6  little bit here.
7
8  REPORTER'S NOTE:  (At this point, instrument was
9  marked for identification by the Reporter as
10  Defendant's Exhibit Number 3, after which, the
11  deposition continued, as follows:)
12
13  Q    (continued by Ms. Creveling)  Okay.  Let
14  me hand you what I've marked as Defendant's
15  Exhibit 3.  It's a document called a "Total
16  Points Detail," and that's for the period of
17  July -- basically mid July '05 through the end
18  of '05.  Tell me, if you, as an employee at
19  MasterBrand, wanted to check to see how many
20  points you had at any given time, would you be
21  able to do that?
22  A    At any given time?
23  Q    Let's say you're just curious where you

Page 83

1  were in the points, could you check?
2  A    We could ask our supervisor or the
3  personnel manager.
4  Q    Who was the personnel manager while you
5  were there?
6  A    Perry.
7  Q    Perry Ezell?
8  A    Yes.
9  Q    Did you ever do that, check on your
10  points?
11  A    Yes.
12  Q    And just so that we're clear for the
13  record, I'm only referring to the time period
14  after the most recent Attendance Policy went
15  into effect in July of 2005.  So after July of
16  2005, at anytime did you check on your points
17  total?
18  A    Yes.
19  Q    Okay.  How many times did you do that; do
20  you recall?
21  A    I'm not sure.
22  Q    Who did you check with?
23  A    There was one other person, the support

Page 84

1  tech.
2  Q    The support tech could also tell you how
3  many points you had?
4  A    They had a copy on the case.
5  Q    Okay.  Was that Linda for you?
6  A    Yes.
7  Q    Okay.  And so again when you checked your
8  points, who did you check with?
9  A    Linda.
10  Q    Why did you check on your points?
11  A    To see how many there was.
12  Q    Were you concerned?
13  A    Not overly concerned; just to keep up
14  with it.
15  Q    Okay.  Do you recall whether you checked
16  before your December '05 absence?
17  A    You're talking about immediately before?
18  Q    At anytime between July and December of
19  '05.
20  A    Yes.
21  Q    Okay.  And did you check after your
22  return to work from your leave of absence?
23  A    No.

21 (Pages 81 to 84)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 85

1 Q    Did Linda give you any document showing
2 your points?
3 A    I looked at hers.
4 Q    Okay.
5 A    It was all -- everybody was on the same
6 page.
7 Q    Okay. Were you looking at a points
8 detail like Exhibit 3? Obviously we've taken
9 out all the other employee names. But is this
10 the type of document you would have looked at?
11 A    Something like that. If that wasn't it,
12 it was something like it.
13 Q    Okay. At the times that you were
14 checking your points, how many points do you
15 recall having?
16 A    I don't remember.
17
18 REPORTER'S NOTE: (At this point, instrument was
19 marked for identification by the Reporter as
20 Defendant's Exhibit Number 4, after which, the
21 deposition continued, as follows:)
22
23 Q    (continued by Ms. Creveling) Let me have

## Page 86

1 you take a look at Exhibit 4, which are your
2 responses to our Request for Admissions. And
3 I'll ask you just to glance through those and
4 let me know if you feel any changes are needed
5 to any of these responses.
6 A    Okay. So it's saying on December --
7     BY MR. ARNOLD: I want to make sure --
8 may I talk with my client for a minute?
9     BY MS. CREVELING: Sure.
10
11 REPORTER'S NOTE: (At this point, an
12 off-the-record discussion was had, after which,
13 the deposition continued, as follows:)
14
15 Q    (continued by Ms. Creveling) Let's take
16 a look at Request for Admission number 1. And
17 you'll need to refer to Exhibit 3 while we're
18 doing this, as well. Okay? Request for
19 Admission number 1 asks you to admit that you
20 were tardy on August 24. If you look at Exhibit
21 3, it shows August 24, '05, that you were tardy
22 for less than two hours and you received a half
23 a point. And in your response you admitted that

## Page 87

1 Exhibit 3 indicated that you had been tardy and
2 you just simply couldn't remember whether or not
3 you had actually been tardy on August 24. Do
4 you still agree with that response?
5 A    Yes.
6 Q    Okay. And Request for Admission number 2
7 simply asks you to admit that you got a half a
8 point for that tardy on August 24. And you
9 admitted that Exhibit 3 indicated that, in fact,
10 the company had given you a half a point, and
11 that the Attendance Policy, which is Exhibit 1,
12 called for you to get a half a point. Are you
13 still in agreement with that response?
14 A    For number 2?
15 Q    For number 2.
16 A    Yes.
17 Q    Okay. What I'm going to do, I'm going to
18 start making a list here of the points so we can
19 add it up and you and I can understand where we
20 agree or disagree on your points total. So
21 we've got August 24, '05, and we have a half a
22 point. Let's take a look at Request for
23 Admission number 3, it asks you to admit that

## Page 88

1 you were absent on September 1, 2005. And again
2 if you refer back to Exhibit 3, it shows an
3 absence on September 1, 2005 and that you were
4 assessed two points. And in your response you
5 admitted that that's what the document
6 accurately showed and you just couldn't remember
7 whether or not you had been absent on September
8 1. Do you still agree with that response?
9 A    Yes.
10 Q    Okay. And Request for Admission number
11 4, again referring to the September 1 absence,
12 it asks you to admit that in accordance with the
13 Attendance Policy, you got two points, and you
14 admitted that. Do you still agree with that
15 response?
16 A    Yes.
17 Q    Okay. Request for Admission number 5
18 referred to a tardy on September 8, 2005. And
19 again if you refer back to Exhibit 3, it shows a
20 tardy of less than two hours on September 8,
21 2005. And you admitted that that's what Exhibit
22 3 showed, and you couldn't remember whether or
23 not you were really tardy on that day. Do you

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 89

1  still agree with that response?
2  A    Yes.
3  Q    Okay. Let's see here. So we've got --
4  going back to our list, we've got an absence on
5  9/1 '05 for which you received two points. And
6  we have then a tardy on September 8th of 2005
7  for which you received a half a point. Request
8  for Admission number 6 asks you to admit that in
9  accordance with the Attendance Policy, you got a
10 half a point on September 8, 2005, and you
11 admitted that. Do you still agree with that
12 response to number 6?
13 A    Yes.
14 Q    Okay. Request for Admission number 7
15 referred to an absence on December 8, 2005. And
16 again if you refer back to Exhibit 3, you'll see
17 that it shows an absence on December 8, 2005,
18 and you admitted that that's what the document
19 showed, and that you couldn't remember whether
20 or not you had been absent that day. Do you
21 still agree with that response?
22 A    Yes.
23 Q    Okay. And as a result of that absence,

Page 90

1  you got two points per the Attendance Policy.
2  You also admitted to that. Any disagreement
3  with that response to number 8?
4  A    No.
5  Q    Okay. And Request for -- let's update
6  our list here. We have an absence on December
7  8, '05, two points. Request for Admission
8  number 9 refers to an early departure from work
9  on December 16, 2005. Again if you refer to the
10 second page of Exhibit 3, you'll show that leave
11 early. Do you still agree with your response to
12 Request for Admission number 9?
13 A    Yes.
14 Q    Okay. And Request for Admission number
15 10 asks you to admit that in accordance with the
16 Attendance Policy, you got a half a point for
17 that leave early. Do you still agree with your
18 response to Request for Admission number 10?
19 A    Yes.
20 Q    Okay. I would like to stop at this
21 minute then and just total up the points that
22 we're in agreement with so far. I come up with,
23 as of December 16, 2005, 5.5 points. Do you

Page 91

1  agree with me on that?
2  A    Is that how many that MasterBrand
3  assessed me?
4  Q    Correct.
5  A    Yes.
6  Q    So we're in agreement with that?
7  A    Yes.
8  Q    And are you in agreement that that is a
9  correct tally of points under the Attendance
10 Policy through December 16, 2005?
11 A    I'm not sure.
12 Q    Okay. Let me mark my little tally sheet
13 here. That might help us.
14
15 REPORTER'S NOTE: (At this point, instrument was
16 marked for identification by the Reporter as
17 Defendant's Exhibit Number 5, after which, the
18 deposition continued, as follows:)
19
20 A    What do you mean, "correct?" If that's
21 what they assessed?
22 Q    (continued by Ms. Creveling) Well, it's a
23 two part question. Let me ask you if you agree

Page 92

1  that that's what they assessed you through
2  December 16, 2005?
3  A    Yes.
4  Q    Okay. And do you disagree with the
5  assessment of any of those points through
6  December 16, 2005? I'm going to hand you
7  Exhibit 5, which is just my shorthand notes of
8  each day we've talked about so far and the
9  points that you got as demonstrated by Exhibit
10 3. I just want to know are there any of those
11 days for which you disagree with the points?
12 A    I am not sure.
13 Q    Why are you not sure?
14 A    Because if 12/16 was when they sent me
15 home on leave, I didn't request to leave early.
16 They sent me home because of leave.
17      BY MS. CREVELING: Let's take a quick
18 break.
19
20 REPORTER'S NOTE: (At this point, a brief recess
21 was taken, after which, the deposition
22 continued, as follows:)
23

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 93

1  Q    (continued by Ms. Creveling)  While we're
2  waiting for those copies then, let me ask you
3  this.  For the points between August 24, 2005
4  and December 8, 2005, do you disagree with any
5  of those points?
6  A    Are you saying do I remember those exact
7  days?
8  Q    Well, we've already established that you
9  don't remember those days.  Any reason to
10 believe that the time clock was inaccurately
11 recording your time for those days?
12 A    Through the 8th?
13 Q    Yeah.
14 A    No.
15 Q    Okay.  And so assuming that the time
16 clock is correct, do you believe that the points
17 from August 24, '05 through December 8, '05 were
18 the correct points to assess you under the
19 Attendance Policy?
20 A    Yes.
21 Q    Okay.  I'm sorry.  I can't add
22 upside-down.  So as of and including your
23 absence on December 8, 2005, you had five

## Page 94

1  points?
2  A    Yes.
3  Q    Okay.
4
5  REPORTER'S NOTE:  (At this point, instruments
6  were marked for identification by the Reporter
7  as Defendant's Exhibits Numbered 6 and 7, after
8  which, the deposition continued, as follows:)
9
10 Q    (continued by Ms. Creveling)  Let me hand
11 you what we've marked as Exhibits 6 and 7, and
12 let's talk a little bit about the events on
13 December 16, 2005.  Exhibit 6 is a document --
14 Exhibit 6 is a document from the Hughston
15 Clinic, and Exhibit 7 is a Request for Leave of
16 Absence form.  Let's look first at Exhibit 6.
17 I'm sorry.  Is your Exhibit 6 dated December 16,
18 '05?  Up in the upper corner.
19 A    Yes.
20 Q    Up in the upper left-hand corner.
21 A    Yes.
22 Q    Okay.  So Exhibit 6 is from the Hughston
23 Clinic dated December 16.  Tell me what you

## Page 95

1  recall of the events of December 16 and what led
2  you to go to the Hughston Clinic.
3  A    My shoulder was in pain.
4  Q    All right.
5  A    And I had to call and make an
6  appointment.
7  Q    Okay.  If you'll look back at Exhibit 2,
8  you'll see that December 16 was a Friday.
9  A    Okay.
10 Q    And that you clocked in at 4:52 and
11 clocked out at 12:30.
12 A    Uh-huh.
13 Q    Okay.  So you were in pain while you were
14 at work that day?
15 A    Yes.
16 Q    Okay.  And you left to go to the doctor's
17 office?
18 A    Yes.
19 Q    Okay.  And this is the sheet -- Exhibit 6
20 is the sheet that the doctor's office gave you
21 for being at the clinic that day; is that right?
22 A    Yes.
23 Q    Okay.  And so then let's talk a little

## Page 96

1  bit about the points that you received on
2  December 16, 2005, and let's look at the Request
3  for Admissions.  We've established that you left
4  work early.  There's no dispute you left work
5  early on December 16, right?
6  A    Right.
7  Q    Okay.  And that you missed more than
8  two -- I'm sorry --
9  A    No.
10 Q    It would have been less than two hours of
11 work that day; is that right?
12 A    Right.
13 Q    We're in agreement there?
14 A    Right.
15 Q    Okay.  And that leaving work early by
16 less than two hours under the Attendance Policy
17 would ordinarily result in the assessment of a
18 half a point; is that right?
19 A    Yes.
20 Q    Okay.  So then let's talk about that half
21 point that you got on the 16th.  Do you agree or
22 disagree with that half point that you got?
23 A    I agree.

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**