MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 97

1  Q    Okay. So then looking at our little
2  tally sheet here on Exhibit 5, as of your leave
3  early on December 16, you had a total of
4  five-and-a-half points. Are we in agreement
5  there?
6  A    Yes.
7  Q    Okay. And then if you would, please,
8  take a look at Exhibit 7. Do you recall filling
9  out this form?
10  A    I remember filling out something.
11  Q    Okay.
12  A    It has my signature on it. So it must
13  have been this.
14  Q    Okay. So let's refer back then to the
15  Request for Admissions, which again is Exhibit
16  4. I'm sorry to switch you around so much.
17  We're picking up with number 11 that asks you to
18  admit that on January 4, 2006, you worked 2.1
19  one hours. And if you refer to Exhibit 2,
20  you'll see that on January 4, the time clock
21  shows that you clocked in at 4:56 a.m. and
22  clocked out at 7:10 a.m. Are you still in
23  agreement with your response --

Page 98

1  A    Yes.
2  Q    -- to Number 11?
3  A    Yes.
4  Q    No reason to believe that the time clock
5  was wrong for that day?
6  A    No.
7  Q    Okay. And number 12 asks you to admit
8  that as a result of leaving work early on
9  January 4, 2006, in accordance with the
10  Attendance Policy, you incurred a point. Are
11  you still in agreement with your response to
12  Request for Admission number 12?
13  A    Yes.
14  Q    Okay. So let's add that to Exhibit 5
15  here. So as a result of leaving early on
16  January 4, 2006, you were up to 6.5 points. Are
17  we in agreement with that?
18  A    That's through January 4th?
19  Q    Yes, including January 4th.
20  A    Yes.
21  Q    Okay.
22       BY MR. ARNOLD: Let the record reflect
23  that the exhibit is changing as we answer the

Page 99

1  questions.
2       BY MS. CREVELING: That's correct. It's
3  a running tally.
4       BY MR. ARNOLD: Okay.
5       BY MS. CREVELING: I just thought it
6  would be easier visually.
7       BY MR. ARNOLD: No. I agree. I just
8  wanted it to be clear on the record; that's all.
9       BY MS. CREVELING: Yeah.
10  Q    (continued by Ms. Creveling) Okay.
11  Let's see here. Where are we? We're on
12  Request for Admission number 13, and it refers
13  to your absence on January 5. It asks you to
14  admit that you were absent on January 5. Do you
15  agree with that response still; that you were
16  absent on January 5?
17  A    I was absent on January 5.
18  Q    Okay. And you're still in agreement with
19  your response to number 13?
20  A    Yes.
21  Q    Okay. Let's talk a little bit about that
22  January 5 absence. The company's records
23  reflect that you called in at 4:38 a.m. and

Page 100

1  stated that you were sick with a high fever and
2  wouldn't be in. Do you have any reason to
3  dispute that transcription of the call in line
4  for that morning?
5  A    No.
6  Q    Okay. Let's see here. Request for
7  Admission number 14 asks you to admit that in
8  accordance with the Attendance Policy, as a
9  result of your absence on January 5, you
10  incurred two points. In your response, you
11  admit that the company records reflect that you
12  got two points, but you disagree with the
13  assessment of those points. Tell me why it is
14  that you disagree with the assessment of those
15  points.
16  A    Because it was the second consecutive day
17  that I was sick from missing work.
18  Q    Okay. So do you believe that you should
19  have received any points for January 5?
20  A    Consecutive days says that vacation days
21  come into play.
22  Q    Okay.
23  A    And I had eighty hours of vacation.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 101

1  Q    Uh-huh. And so again my question is, do
2  you believe you should have gotten any points
3  for January 5?
4  A    Since it was a consecutive day, I would
5  say no.
6  Q    Okay.
7  A    Vacation days should have been used.
8  Q    Let's talk a little bit about that
9  consecutive day notion. Does it have to be two
10 full days?
11 A    As far as I know, it doesn't say.
12 Q    Okay. What's your understanding of it?
13 A    If you're missing work for two
14 consecutive days with an illness --
15 Q    Okay.
16 A    -- then vacation hours or scheduled time
17 off comes into play.
18 Q    And my question to you is, what
19 constitutes a consecutive day? Is it an eight
20 hour day, or is it okay if you're absent for
21 four hours, and then the next day you're absent
22 eight hours? What does that -- how does that
23 work?

## Page 102

1  A    When you're sick for consecutive days
2  missing work.
3  Q    No matter how many hours of work you
4  miss? The reason I ask, for example, you worked
5  part of the day on January 4. So you didn't
6  have a full day's absence on January 4. You had
7  a full day absence on January 5. In your view,
8  that's two consecutive days of absence even
9  though you worked part of the day on January 4?
10 A    Yes.
11 Q    Okay. So you believe that the company
12 should have automatically taken your vacation
13 time for January 5?
14 A    Yes.
15 Q    Okay. And accordingly, you don't believe
16 you should have received any points for January
17 5; is that correct?
18 A    Right.
19 Q    Okay. Did you talk directly with anybody
20 at the company on January 5?
21 A    No.
22 Q    Did you, in any manner, communicate to
23 the company that you wanted to use vacation time

## Page 103

1  for January 5, 2006?
2  A    No.
3  Q    Okay. Let's take a look at, I think,
4  Request for Admission number 15, which refers to
5  your absence on January 6. Are you in agreement
6  with your response to request number 15?
7  A    I agree.
8  Q    Okay. If the transcription from the
9  call-in line on January 6 shows that you called
10 in at 4:44 a.m and reported that you would not
11 be in to work that day, would you have any
12 reason to disagree with the transcription of the
13 call-in line for that day?
14 A    No.
15 Q    Okay. Tell me what was going on with you
16 on January 6, 2006.
17 A    I was still sick. My abdominal area was
18 sore.
19 Q    All right. Let's see here. Request for
20 Admission number 16, it asks you to admit that
21 in accordance with the Attendance Policy, the
22 company assessed a point for your absence on
23 January 6. You admitted that the company's

## Page 104

1  records reflected that you were assessed a
2  point, but denied that you were -- or denied
3  that you should have been given that point. Are
4  you still in agreement with that response?
5  A    Yes.
6  Q    Okay. Tell me why it is that you think
7  you should not have received a point on January
8  6.
9  A    Because I was still sick that third day,
10 and I had vacation hours. So according to the
11 Attendance Policy, it was supposed to be used.
12 Q    Did you speak with anybody at the company
13 directly on January 6, 2006?
14 A    No.
15 Q    Did you communicate to anyone at the
16 company at anytime that you wanted to use
17 vacation for your absence on January 6?
18 A    No.
19 Q    Through your absence of January 6, 2006,
20 how many points do you think you should have
21 had?
22 A    Six-and-a-half.
23 Q    Okay. What happened on January 7? Were

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

| Page 105 |
|---|

1  you scheduled to work that Saturday?
2  A    Yes.
3  Q    Would that have been overtime hours for
4  you? Had you been there all week?
5  A    If I had been there all week, yes.
6  Q    Okay. Was that mandatory overtime?
7  A    Yes.
8  Q    What did you do on January 7th?
9  A    I came to work; clocked in.
10 Q    What time did you come to work on January
11 7?
12 A    I don't remember.
13 Q    Okay. Do you remember what time you were
14 scheduled to start that day?
15 A    I don't remember.
16 Q    Okay. And what happened once you got to
17 work?
18 A    We were waiting for stretch-and-flex with
19 the other employees. I showed Linda my doctor's
20 excuse, and she said, "You'll have to give it to
21 John." And when John came, I gave it to him.
22 He said, "We don't accept doctor's excuses." As
23 far as he's concerned, I didn't have a job

| Page 106 |
|---|

1  there. If I wanted to come back to personnel on
2  Monday, I could.
3  Q    Was John there when you reported for work
4  that Saturday morning?
5  A    I believe he was.
6  Q    Okay.
7  A    He wasn't around at the time.
8  Q    Okay. I think I missed part of what you
9  said before. You had a doctor's excuse for
10 those days that you had been absent?
11 A    Yes.
12 Q    Okay. What doctor did you have an excuse
13 from?
14 A    The one at -- I believe it began with
15 "Z". I don't remember exactly.
16 Q    Okay.
17 A    But --
18 Q    Was he affiliated with a particular
19 hospital or practice, though?
20 A    Yes. It was Auburn Urgent Care.
21 Q    Okay.
22 A    I may have seen the guy that started with
23 a "Z" another time. I don't remember.

| Page 107 |
|---|

1  Q    Do you remember when you had been to
2  Auburn Urgent Care?
3  A    I went in on the 4th.
4  Q    Okay. Did you go on the 5th or 6th?
5  A    I went one more day --
6  Q    Okay.
7  A    -- during that time. I'm not sure of the
8  date, though.
9  Q    Okay. And what type of note did you have
10 from the doctor at the Urgent Care place?
11 A    It just said I was sick and excuse me for
12 the 4th through the 6th; return to work on the
13 7th.
14 Q    Did you believe that the doctor's note
15 excusing you from work would have any impact on
16 whether or not you received points under the
17 Attendance Policy?
18 A    Repeat that, please.
19 Q    Sure. Let me rephrase that. If an
20 employee came into work with a doctor's excuse,
21 under the company's Attendance Policy, would
22 that exempt them from getting points?
23 A    Exempt them, no.

| Page 108 |
|---|

1  Q    Okay. Did you tell me that you initially
2  tried to give your doctor's excuse to somebody
3  besides than John Oleinick?
4  A    Linda.
5  Q    All right.
6  A    I showed it to Linda first.
7  Q    Okay. And Linda being the support tech?
8  A    Yeah. She was the one there --
9  Q    Okay.
10 A    -- waiting for stretch-and-flex. He
11 wasn't there. John wasn't there yet.
12 Q    Okay. And Linda told you to give it to
13 John?
14 A    Yes.
15 Q    About how much later was it that you saw
16 John?
17 A    I don't know.
18 Q    Did you ever actually start working?
19 A    No.
20 Q    So it's fair to say it was pretty early
21 in the morning that you saw John?
22 A    Yes.
23 Q    Or pretty early at the start of whatever

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

Page 109

1  that time day was?
2  A   Yes.
3  Q   Okay. And I'm sorry. Tell me again what
4  it is that John told you when you gave him the
5  doctor's excuse?
6  A   He said, "I don't accept doctor's
7  excuses," and as far as he was concerned, I no
8  longer had a job there.
9  Q   Okay. And what was your response?
10  A   That -- he also said that I could come
11  back to personnel on Monday.
12  Q   Okay.
13  A   I didn't respond. He gave me back my
14  doctor's excuse; I took it and left.
15  Q   Do you still have a copy of that doctor's
16  excuse?
17       BY MR. ARNOLD: It's been produced. It's
18  in the initial disclosures. It's not Bates
19  labeled.
20       BY MS. CREVELING: Okay.
21       BY MR. ARNOLD: I don't know why my staff
22  only Bates labeled half of the documents.
23       BY MS. CREVELING: Okay.

---

Page 110

1  Q   (continued by Ms. Creveling) You didn't
2  ask John why it was that you didn't have a job?
3  A   No.
4  Q   Were you surprised?
5  A   Not after a friend of mine called me on
6  Friday and told me that they were firing me --
7  Q   Okay.
8  A   -- while I was still out sick.
9  Q   Who called you on Friday?
10  A   Tracy Moncus.
11  Q   And Tracy, I think you told me, was
12  another material handler; is that right?
13  A   Yes.
14  Q   Okay. And what was it that Tracy told
15  you?
16  A   In short terms, that they fired me;
17  they're replacing me; something like that.
18  Q   Was that the sole reason why Tracy was
19  calling you?
20  A   Yes.
21  Q   Did Tracy tell you how he came by this
22  information?
23  A   No.

---

Page 111

1  Q   Did Tracy tell you why the company was
2  firing you?
3  A   I'm not sure what all he said. I just
4  remember that part; that he said I was being
5  fired.
6  Q   You don't remember him telling you why?
7  A   I'm not sure if he said because of points
8  or not. He may have.
9  Q   Okay. Where did Tracy get his
10  information?
11  A   I don't know.
12  Q   Okay. Is Tracy still with the company?
13  A   I think so.
14  Q   What was your response to Tracy?
15  A   You mean what did I say to him?
16  Q   Yes.
17  A   I don't remember.
18  Q   Okay. How long did this conversation
19  last?
20  A   I don't remember.
21  Q   Did Tracy call you at your home phone?
22  A   It was more than likely my cell phone.
23  Q   Where were you when you received this

---

Page 112

1  call?
2  A   At home.
3  Q   What was your cell phone number back
4  then?
5  A   I think it was 332-2234.
6  Q   I'm sorry. 332 what?
7  A   2234, I think.
8  Q   What area code would that be? Is that
9  334?
10  A   334.
11  Q   Okay. And who was your cellular provider
12  back then?
13  A   Cingular.
14  Q   Is that the same service you have today?
15  A   No.
16  Q   Okay. Where was Tracy calling you from?
17  A   I don't know.
18  Q   About what time of day did this call come
19  in?
20  A   I don't know.
21  Q   Were you surprised when Tracy told you
22  you were getting fired?
23  A   Yes.

---

28 (Pages 109 to 112)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 113

1  Q    Okay. Did you -- what did you do as a
2  result of Tracy's phone call and the information
3  he gave you?
4  A    I didn't do anything.
5  Q    Why not? Why not call up the company and
6  say, "I've heard I'm being fired. What's going
7  on?"
8  A    For one thing, is every rumor true? I
9  don't know. So I didn't know if it was true or
10 not.
11 Q    Okay. Why not call up the company and
12 find out?
13 A    I don't know.
14 Q    Okay. Did you -- once you heard this
15 rumor that you were being fired, did you check
16 with anyone at the company to see what your
17 points total was?
18 A    No.
19 Q    Prior to your return to work on January
20 7, 2006, had you heard from anybody else at the
21 company that you were being fired?
22 A    No.
23 Q    All right. So after -- back on January

## Page 114

1  7, after John told you that they don't accept
2  doctor's notes and as far as he was concerned,
3  you didn't have a job anymore, but you could go
4  to personnel on Monday, what did you do then?
5  You told me you took back the doctor's excuse,
6  and then what happened after that?
7  A    Let's see. Perry said the same thing.
8  When I handed him my excuse, he said they didn't
9  accept doctor's excuses anymore; that I have
10 nine-and-a-half points.
11 Q    Is that what happened on Monday?
12 A    Yes.
13 Q    Okay. Before we get to Monday, tell me
14 what else happened on the 7th. After you took
15 back the doctor's excuse, what did you do next?
16 A    I clocked out and went home.
17 Q    Okay. Did you talk to anybody at the
18 company between the time you had this discussion
19 with John and when you went home?
20 A    No.
21 Q    After you went back home on -- or left
22 work on January 7, that Saturday, what did you
23 do?

## Page 115

1  A    I don't remember.
2  Q    Did you talk to anybody from the company
3  about your termination on the 7th?
4  A    I don't remember.
5  Q    Okay. Did you talk to anybody from the
6  company on the 8th about your termination?
7  A    Sunday?
8  Q    Yes.
9  A    Not that I know of.
10 Q    Okay. So then Monday was January 9th. I
11 understand that you went back in to talk to
12 Perry?
13 A    Yes.
14 Q    Okay. Tell me about that conversation.
15 A    Okay. I handed him my doctor's excuse,
16 and he said that they didn't accept doctor's
17 excuses; that I have nine-and-a-half points, and
18 pointed out that I didn't have a job. So I
19 reached for my doctor's excuse; he handed it
20 back; I got up and left.
21 Q    Where did that meeting take place?
22 A    I believe that was Perry's office. It
23 used to be Jimmy's. So I guess it's the

## Page 116

1  personnel manager's office.
2  Q    Okay. Anybody else present?
3  A    No.
4  Q    Is it your belief that Perry engaged in
5  retaliation against you for having taken a leave
6  of absence?
7  A    Yes.
8  Q    Tell me why.
9  A    I don't know why.
10 Q    I'm sorry. Tell me -- tell me why you
11 believe Perry retaliated against you.
12 A    I really don't know. I don't know why.
13 Q    Okay. I'm not asking you to tell me what
14 actually motivated Perry, but what acts did
15 Perry take that lead you to believe he was
16 retaliating against you.
17 A    What acts; what did he do?
18 Q    Yeah, what did he do and what did he say?
19 A    He just said what I said he said, and
20 that was it.
21 Q    Okay. And what makes you think that that
22 was tied to your leave of absence?
23 A    Because I had vacation hours, and it

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 117

1  shouldn't have been counted up to
2  nine-and-a-half points, anyway.
3  Q    Did you explain that to Perry on January
4  9?
5  A    No, I didn't.
6  Q    Why not?
7  A    Because he was the second person that
8  said I didn't have a job there.
9  Q    Uh-huh.
10 A    A lot of talking wouldn't have done any
11 good.
12 Q    Why? Why do you think that?
13 A    Because it just -- I don't know. It just
14 -- I haven't heard anybody else talk their way
15 back in.
16 Q    Okay. Did you tell John, when you talked
17 to him on the 7th, that it was a mistake and
18 that your vacation time should have been taken
19 instead?
20 A    Did I tell John?
21 Q    Yeah.
22 A    No.
23 Q    Okay. So why is it that you believe that

Page 118

1  Perry was retaliating against you rather than
2  simply making a mistake or not realizing that
3  you had vacation available?
4  A    Could you repeat that?
5  Q    Sure. Why is it that you think Perry was
6  trying to retaliate against you for having taken
7  leave --
8  A    What do I think?
9  Q    -- as opposed to Perry just made a
10 mistake or Perry didn't know you had vacation
11 time?
12 A    Why do I believe; is that what you're
13 saying?
14 Q    Yes. What makes you think Perry was out
15 to get you because you took a leave of absence?
16 Is that what you believe?
17 A    I believe it was --
18     BY MR. ARNOLD: Object to form.
19 Q    (continued by Ms. Creveling) Let's start
20 over. Do you believe that Perry specifically
21 wanted to terminate your employment because you
22 took a leave of absence in December of '05?
23 A    Do I believe it?

Page 119

1  Q    Yes.
2  A    Yes.
3  Q    Tell me why you believe that.
4  A    I believe him and John -- it was based on
5  him and John's conversation.
6  Q    Okay. And what conversation are you
7  referring to?
8  A    I don't know. I didn't particularly say
9  that they had one, but generally the supervisor
10 will talk with the personnel manager about
11 somebody if they're going to be fired.
12 Q    So you don't know if Perry and John
13 actually had any conversations about terminating
14 you?
15 A    You asked me what I believe.
16 Q    Right. I'm asking you, do you know, in
17 fact, whether or not Perry and John had any
18 conversations about terminating you?
19 A    Do I know for sure?
20 Q    Yes.
21 A    I don't know.
22 Q    Okay. Any other reason why you believe
23 that Perry terminated you because you took a

Page 120

1  leave of absence in December of '05?
2  A    Could you repeat that?
3  Q    Sure. Any other reason that you believe
4  Perry terminated you because you took a leave of
5  absence in 2005?
6  A    No.
7  Q    Okay. Do you believe that John Oleinick
8  had the authority to terminate your employment?
9  A    Yes.
10 Q    Okay. Do you believe that John Oleinick
11 terminated your employment because you took a
12 leave of absence in December 2005?
13 A    Yes.
14 Q    Why do you believe that John Oleinick
15 terminated you because you took a leave of
16 absence in December 2005?
17 A    Because he put a strain on trying to run
18 the department with a person missing.
19 Q    How many employees, roughly, did John
20 Oleinick supervise in the Door Warehouse when
21 you were there?
22 A    I believe it was about twenty.
23 Q    To your recollection, did any of those

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 121

1  other nineteen people ever take a leave of
2  absence while John supervised them?
3  A    I don't know.
4  Q    Is it your belief that John Oleinick
5  fired other people because they took a leave of
6  absence?
7  A    Do I believe?
8  Q    Yes.
9  A    I don't know.
10  Q    Okay. Are you able to identify for me
11  anybody else who -- are you able to identify for
12  me anybody who accumulated nine points, but was
13  not fired?
14  A    I don't know.
15  Q    Okay. Are you able to identify anyone --
16  anyone else who the company failed to apply that
17  consecutive day absence rule to?
18  A    I don't know.
19  Q    Okay.
20        BY MS. CREVELING: Let's take just a
21  quick break.
22
23  REPORTER'S NOTE: (At this point, a brief recess

Page 122

1  was taken, after which, the deposition
2  continued, as follows:)
3
4  Q    (continued by Ms. Creveling) Let's see
5  here. Are you able to identify anyone who was
6  allowed to use vacation and not get points for
7  consecutive days absences?
8  A    I don't know.
9        BY MR. ARNOLD: Let's put on the record,
10  you've got outstanding discovery on some of
11  these issues that you're -- not all -- but some
12  of these issues you're discussing for --
13        BY MS. CREVELING: Correct. You have
14  asked for -- we have identified all the
15  individuals who received written warnings under
16  the Attendance Policy and all the people who
17  were terminated under the Attendance Policy, and
18  have agreed to produce the attendance records
19  for those people.
20        BY MR. ARNOLD: Correct.
21        BY MS. CREVELING: Okay.
22        BY MR. ARNOLD: I just don't want a lot
23  of these "I don't know" answers -- an extensive

Page 123

1  discovery period remaining to be
2  misinterpreted --
3        BY MS. CREVELING: Sure. No. I'm just
4  looking for his personal knowledge right now; if
5  he can point me to any other employees.
6        BY MR. ARNOLD: Okay.
7  Q    (continued by Ms. Creveling) Let's refer
8  back to the Request for Admissions. I think
9  we've covered number 17. Number 18 and 19, are
10  you still in agreement with those responses?
11  A    17, 18 and 19?
12  Q    Yeah.
13        BY MR. ARNOLD: He needs to see the
14  exhibits, I think, in order to verify. Seeing
15  how they're admitted, I don't think that's
16  really going to be a problem.
17        BY MS. CREVELING: Okay.
18  Q    (continued by Ms. Creveling) For 18 and
19  19, it's referring to what we've already marked
20  as Exhibit 1.
21  A    Huh?
22  Q    Are you still in agreement with your
23  responses to 17 through 19?

Page 124

1  A    Yes.
2  Q    Okay. I think 20 we've already covered.
3  Any change to your responses to 21 or 22?
4  A    No changes.
5  Q    Okay. When you sat down to talk to Perry
6  on January 9, do you recall him presenting you
7  with any paperwork?
8  A    He did not.
9  Q    Okay. And if the company has a
10  disciplinary form that shows you refused to sign
11  it, what would be your response to that?
12  A    Repeat that, please.
13  Q    Sure. If the company has a document -- a
14  disciplinary document that indicates that you
15  were shown it, but refused to sign it, would you
16  agree or disagree with that?
17  A    I haven't seen any documents.
18  Q    Okay.
19  A    And I haven't refused to sign any.
20  Q    Okay.
21
22  REPORTER'S NOTE: (At this point, instrument was
23  marked for identification by the Reporter as

31 (Pages 121 to 124)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 125

1  Defendant's Exhibit Number 8, after which, the
2  deposition continued, as follows:)
3
4  Q    (continued by Ms. Creveling) Let me show
5  you what we've marked as Exhibit 8. That's a
6  receipt showing that you received a copy of the
7  Employee Handbook in 2004. Is that your
8  signature there?
9  A    Yes.
10  Q    Okay. Did you ever read through the
11  handbook?
12  A    Did I ever read through it?
13  Q    Yeah.
14  A    While I was there?
15  Q    Yeah, while you were employed.
16  A    No.
17  Q    Okay.
18
19  REPORTER'S NOTE: (At this point, instrument was
20  marked for identification by the Reporter as
21  Defendant's Exhibit Number 9, after which, the
22  deposition continued, as follows:)
23

Page 126

1  Q    (continued by Ms. Creveling) Let me hand
2  you Exhibit 9. Tell me if you've seen this
3  before.
4  A    Yes.
5  Q    Do you remember approximately when you
6  received this letter?
7  A    Do I remember?
8  Q    Yes.
9  A    No.
10  Q    Okay. Did you call anyone at the company
11  when you -- once you received this letter?
12  A    No.
13  Q    Okay. Are you aware that the company had
14  a hot line -- 800-number-type hot line that
15  employees could call if they believed that they
16  were being retaliated against, harassed,
17  discriminated against, what have you?
18  A    Retaliated against or harassed?
19  Q    Yes.
20  A    Not retaliated against. I thought there
21  was something -- I may have seen something from
22  some company saying something about a hot
23  line -- if it was like sexual harassment. But

Page 127

1  other than that --
2  Q    Did you ever call the hot line to
3  complain that you thought that Perry and John
4  were retaliating against you because you took
5  Family Medical Leave?
6  A    That I took what?
7  Q    That you took Family Medical Leave; that
8  you took a leave of absence.
9  A    Did I call the hot line?
10  Q    Yes.
11  A    I didn't know there was one for being
12  fired.
13  Q    Okay. Did you complain to anyone about
14  your termination?
15  A    You're talking about anyone -- who?
16  Q    Anybody.
17  A    My wife?
18  Q    Okay. Anybody besides your wife?
19  A    I'm asking you. You're talking about
20  like my wife?
21  Q    Anybody.
22  A    Let's see. I'm not sure that I did. I
23  remember -- I may have talked to Tracy about it.

Page 128

1  Q    Were you and Tracy friends outside of
2  work?
3  A    Did we do stuff together?
4  Q    Yes.
5  A    No.
6  Q    Have you maintained contact with Tracy?
7  A    I call Tracy on occasion.
8  Q    Okay. Is Tracy aware you filed this
9  lawsuit?
10  A    Yes.
11  Q    Okay. Is Tracy prepared to testify on
12  your behalf?
13      BY MR. ARNOLD: Objection.
14  A    I didn't ask him --
15  Q    (continued by Ms. Creveling) Okay.
16  A    -- really.
17  Q    Do you believe that Tracy has information
18  relevant to this complaint, this litigation?
19  A    I'm not sure.
20  Q    Who else at the company have you
21  maintained contact with?
22  A    That I've called on occasion?
23  Q    Called or seen or whatever; any kind of

32 (Pages 125 to 128)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 129

1   contact.
2   A   Gloria Durham and Linda Thomas.
3   Q   Is Gloria Durham the other material
4   handler you mentioned earlier?
5   A   Yes.
6   Q   And Linda Thomas, is she the support
7   tech?
8   A   Yes.
9   Q   Okay. Anybody else?
10  A   I talked to Craig.
11  Q   Who's Craig?
12  A   I don't remember his last name.
13  Q   Okay. What position does he have?
14  A   I don't know.
15  Q   Is he an hourly employee; member of
16  management?
17  A   I think it's hourly.
18  Q   Okay. Anybody else?
19  A   That still works there?
20  Q   Yeah.
21  A   Not that I can remember.
22  Q   Okay. Does Gloria have any information
23  relevant to this litigation?

Page 130

1   A   Does she have any or does she know some?
2   Q   Yes.
3   A   I don't know.
4   Q   Okay. How about Linda?
5   A   I don't know.
6   Q   Okay. How about Craig?
7   A   I don't know.
8   Q   Okay. You told me that you believe John
9   Oleinick and Perry Ezell terminated you because
10  you took a leave of absence in December of '05.
11  Is there anybody else at the company that you
12  believe was involved in the decision to
13  terminate your employment?
14  A   Do I believe there was someone else?
15  Q   Yes.
16  A   I don't think so.
17  Q   Okay. Is there anyone else at the
18  company whom you believe took some sort of
19  action again you because you took a leave of
20  absence?
21  A   You say do I believe there's someone
22  else? Is there someone else?
23  Q   Right. Who took any kind of action;

Page 131

1   not just in terms --
2   A   Do I believe or did somebody actually do
3   it?
4   Q   Do you believe that anybody else took any
5   kind of action against you because you took a
6   leave of absence?
7   A   No, I don't believe there is.
8   Q   Have you talked with Tracy about this
9   whole notion that you should have been allowed
10  to use vacation time instead of getting points
11  for your absences in January?
12      BY MR. ARNOLD: Object to form.
13  A   I don't know.
14  Q   (continued by Ms. Creveling) Okay. Have
15  you talked to Linda about your understanding
16  that you should have been allowed to use
17  vacation time instead of getting points in
18  January of '06?
19  A   Did I talk with Linda about that?
20  Q   Yes.
21  A   No.
22  Q   Okay. Did you talk to Gloria about that
23  same issue?

Page 132

1   A   No.
2   Q   Okay. Did you talk to Craig?
3   A   No.
4   Q   At anytime have you attempted to verify
5   with anybody at the company that you should have
6   been allowed to use vacation time instead of
7   getting points for your absences in January?
8   A   Did I talk with anybody else in the
9   company?
10  Q   Yes.
11  A   No.
12  Q   You told me about the comment that John
13  Oleinick made to the effect of, "We're in the
14  same fix as before." Were there any other
15  comments that John made along those same lines?
16  A   No.
17  Q   Okay. Any other comments that John made
18  that you thought were inappropriate regarding
19  your absences or your leave?
20  A   No.
21  Q   Okay.
22  A   Absences or leave; is that what you said?
23  Q   Yes.

33 (Pages 129 to 132)

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 133

1  A    No.
2  Q    Did Perry make any comments to you that
3  you found to be inappropriate regarding your
4  leave?
5  A    BY MR. ARNOLD: Besides what he's already
6  testified to?
7        BY MS. CREVELING: Well, he's testified
8  that they don't take doctor's excuses and you
9  have points. I mean, I'm assuming he thought
10 that was wrong.
11 Q    (continued by Ms. Creveling) But in
12 terms of comments about taking leave or --
13 A    Did he make any comments about taking
14 leave?
15 Q    Yeah.
16 A    No.
17 Q    Okay. Back in December of 2005, who did
18 you deal with regarding your leave of absence?
19 I think you told me you had to go to the office
20 and fill out some papers. Who specifically did
21 you deal with?
22 A    I don't know. It was a young lady.
23 Q    Okay. Does the name Kim Couch ring any

Page 134

1  bells with you?
2  A    It sounds familiar.
3  Q    How about a Kirstin Ray (SP)?
4  A    I think Kim -- Kim sounds familiar.
5  Q    Okay. Do you have any complaints at all
6  about your treatment by Kim Couch?
7  A    No.
8  Q    Anybody else in H.R., besides Perry?
9  A    No.
10 Q    Okay. The Vacation Policy that you've
11 described to me today, was that contained in the
12 Employee Handbook?
13 A    I don't know.
14 Q    You don't know?
15 A    I don't know.
16 Q    Okay. Did you have a copy of it in
17 writing?
18 A    Of the handbook?
19 Q    Of the Vacation Policy that you've
20 described to me.
21 A    I don't know.
22 Q    Okay. Who is Christy Evans?
23 A    Material handler.

Page 135

1  Q    Okay. Was she also supervised by John
2  Oleinick?
3  A    Yes.
4  Q    Okay. I'll represent to you that in your
5  response to Interrogatory number 2, you
6  indicated that Christy Evans witnessed your
7  doctor's excuse being delivered to John Oleinick
8  and his refusal to accept the excuse. Tell me
9  what role -- where Christy was and what role
10 Christy had in that conversation with John
11 Oleinick.
12 A    Christy was standing around waiting for
13 stretch-and-flex. John came around the corner;
14 I handed it to him. So probably something like
15 that, if they were looking.
16 Q    Okay.
17 A    Because everybody was there doing
18 stretch-and-flex. Most of them were there
19 already.
20 Q    Okay. Do you remember anybody else being
21 there? I think you told me Linda Thomas and
22 Christy Evans. Anybody else you recall being in
23 the area when you came in on January 7 and

Page 136

1  talked to John?
2  A    There may have been some more. I don't
3  remember exactly who.
4  Q    Okay. In your complaint, you ask for
5  reinstatement to your job at MasterBrand. Are
6  you still interested in reinstatement to that
7  job?
8  A    Seeing as how I was treated when I was
9  there, I would have to say no.
10 Q    Okay. When you returned to work on
11 January 3, 2006, did John Oleinick complain to
12 you about having to cover for you while you were
13 out on your leave of absence?
14 A    I don't remember him complaining. What
15 did you say; did he complain to me?
16 Q    Right.
17 A    I don't remember it.
18 Q    Do you remember him complaining at any
19 other time about having to cover for you during
20 your leave of absence in December of '05?
21 A    I don't remember any, no.
22 Q    Do you remember any other employees
23 complaining that they had to cover for you

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legallink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 137

1  during your leave of absence?
2  A    Not complaining, no.
3  Q    Okay.  I forget now who you told me
4  covered, besides John.  Who else was it?
5  A    Tracy.
6  Q    Tracy.  Did Tracy ever complain to you?
7  A    Complain about covering for me?
8  Q    Yes.
9  A    No.
10  Q    Okay.  In your complaint, you allege that
11  MasterBrand violated the Attendance Policy when
12  it didn't honor your doctor's excuse for your
13  absences in January.  Are we now in agreement
14  that the fact that you had a doctor's note for
15  those days didn't make any difference under the
16  Attendance Policy?
17  A    It makes a difference as far as when you
18  have a doctor's excuse, that means you were
19  sick, and then vacation days would have been
20  used.
21  Q    Okay.  So it matters for the purpose of
22  establishing consecutive absences?
23  A    Yes.

Page 138

1  Q    But we're in agreement that it does not
2  otherwise exempt somebody from getting points?
3      BY MR. ARNOLD:  Object to form.
4  Q    (continued by Ms. Creveling) We're in
5  agreement that a doctor's excuse on its own does
6  not exempt someone from getting points under the
7  Attendance Policy?
8  A    If they have no vacation days, right.
9  Q    Okay.  Is there anyone who we haven't
10  discussed today who would have information
11  relevant to your leave of absence in December of
12  '05?
13  A    I really don't know.  You're talking
14  about --
15  Q    Is there anybody else we haven't
16  discussed who has information about your leave
17  of absence in December of '05?
18  A    I don't think there is.
19  Q    Okay.  Is there anybody we haven't
20  already discussed who has information about the
21  reasons for your -- for the termination of your
22  employment?
23  A    Not to my knowledge.

Page 139

1  Q    Okay.
2      BY MS. CREVELING:  I don't believe I have
3  any other questions.
4      BY MR. ARNOLD:  I have no questions,
5  either.

7      (END OF PROCEEDINGS)

Page 140

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA  )
4                    )
5  JEFFERSON COUNTY  )
6
7      I hereby certify that the above and
8  foregoing deposition was taken down by me in
9  stenotype and the questions and answers thereto
10  were transcribed by means of computer-aided
11  transcription, and that the foregoing represents
12  a true and correct transcript of the testimony
13  given by said witness upon said hearing.
14
15      I further certify that I am neither
16  counsel, nor of kin to the parties to the
17  action, nor am I in any way interested in the
18  result of said cause.
19
20
21
22      Kelly J. Gray, C.S.R.
23

35 (Pages 137 to 140)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 141

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

# EXHIBIT 1



## ATTENDANCE POLICY
## EFFECTIVE JULY 18, 2005

### ASSOCIATE RECEIPT

I have received my personal copy of the MBCI Attendance Policy and my transition "hours to points" sheet. I understand that it is my responsibility to become familiar with the contents of this material and to ask for clarification on any policy.

I understand that neither this document, nor any other Company document, constitutes a contract or agreement of any kind. This handbook does not constitute a contract of employment, should not be construed as one and employment at MBCI is "at will." From time to time, employees may be informed orally or in writing of changes in Company rules, including additions and deletions. The Company reserves the right to change policies at any time with or without notice.

_Ronni Giles_ 7-15-05
Associate signature                                          Date

_Ronnie Giles_
Print Name

DEFENDANT'S
EXHIBIT

1



## Attendance Policy

Effective: July 18, 2005

## POLICY STATEMENT

Employees are expected to consistently report on time and be prepared to work. Employees are also expected to work all scheduled hours including overtime, if scheduled. The failure to maintain prompt and regular attendance adversely impacts the Company's production schedule.

This Attendance Policy sets forth the Company's expectations with respect to attendance and the consequences for failing to meet those expectations. Effective July 18, 2005, this Attendance Policy replaces all prior attendance policies including the Attendance Policy found in the Employee Handbook dated January 2003.

## CLOCKING PROCEDURES

Employees are required to clock in at the start of their shift and clock out at the end of their shift. Employees may not clock in earlier than 15 minutes prior to the start of their shift. Clocking entries for pay and/or overtime purposes that do not correspond with an employee's scheduled working hours require the approval of the employee's supervisor. Employees are required to immediately exit the premises upon clocking out.

Employees who are leaving Company property for any non-work related reason at any time during their scheduled shift are required to clock out before leaving and clock back in upon their return.

An employee who violates the clocking procedures may be subject to disciplinary action, up to and including termination.

## REPORTING AN ABSENCE -- CALL IN PROCEDURE

Employees who will be absent from work must call in and report their Absence by leaving a message at 334-502-1017. An Absence must be reported prior to the start of the employee's scheduled shift in order to avoid the assessment of an additional point. An employee must leave their name, department, supervisor's name, and reason on the message. The time of the message will be recorded. Absent an emergency, employees must personally leave the message on the Absence Line -- messages from third parties will not be accepted.

## ASSESSMENT OF ATTENDANCE POINTS

Employees will be assessed attendance points based upon the nature and amount of time missed from work as well as the ability to provide appropriate notification.

| Event | Attendance Points Assessed | Description |
|---|---|---|
| Late Arrival | .5 | Failing to be clocked in and be at the workstation by the scheduled starting time (defined as 2 hours or less). |
| | 1 | Failing to be clocked in and be at the workstation by the scheduled starting time (defined as more than 2 hours). |
| Early Departure/ Break in Workday | .5 | Either early departure or break in workday which is 2 hours or less. Any departure requires supervisor approval |
| | 1 | Either early departure or break in workday which is more than 2 hours. Any departure requires supervisor approval. |
| Absence | 2 | An employee who misses a scheduled shift. For consecutive days absent 1 point will be assessed for each consecutive day after the first. (See example below). |
| No Call | 1 | An employee who fails to notify the Company of an Absence prior to the start of the scheduled shift shall be assessed an additional point. |

"Scheduled starting time" is the time an employee is expected to report to work on the day in question.

"Scheduled shift" is all hours, including overtime, an employee is expected to work on the day in question.

"Point Reduction" - point values drop six (6) months from issue.

## RELATED CONSECUTIVE ABSENCES

The Company understands that, in limited circumstances, this policy could substantially impact an employee with otherwise good attendance. An employee who is required to miss consecutive work days due to their own medical condition or that of a dependent child shall only be assessed one (1) point per day following the initial absence. An employee shall only be entitled to this reduced point schedule provided the employee timely reports each day's absence on the Absence Line and the employee has exhausted all Scheduled Time Off and Vacation.

**Example:** Dependent child wakes up sick on Thursday morning. Employee timely calls in to report his/her absence. Dependent child remains sick on Friday and Saturday (employee is scheduled to work both days but is unable to work because the employee does not have dependent care). Employee must timely call in to report each day's absence. At the time of the dependent child's illness, the employee has 2 hours of Scheduled Time Off and 8 hours of vacation time remaining.

Under this scenario, Thursday counts as an Absence so the employee will be assessed 2 points. Friday's absence from work can be covered by Scheduled Time Off and vacation (assuming this employee is scheduled to work no more than 10 hours). The employee may be able to partially cover their absence from work on Saturday with the remaining hours of vacation, if any. If Saturday cannot be covered with vacation, the employee would be assessed one additional point provided he/she timely reports the Absence.

Total points assessed for these 3 days are either 2 or 3 points.

## DISCIPLINARY ACTION

An employee will be issued the following disciplinary action if they receive or exceed the points listed below:

> 3 Points = Verbal Warning
> 6 Points = Written Warning
> 9 Points = Termination of Employment

An employee's accountability for their attendance will be measured on a rolling six (6) month basis -- measured backward -- from the date of the most recent occurrence. It is each associate's responsibility to be aware of their own attendance record and their absence history, including their work record as defined by disciplinary action. In other words, it is ultimately the employee's and not the Company's responsibility to be aware of and keep track of attendance points. An employee may request a review of their attendance record at any time through the Human Resources Department. Disciplinary action will occur as required under this policy based on the Company's periodic monitoring of employees' attendance records.

## EXCUSED ABSENCES

The following represent excused Absences that will not count against an employee under the Attendance Policy:

> Approved Vacations
> Holidays
> Jury Duty

3

An Approved Leave of Absence
Subpoenaed as a witness in a court hearing

<u>Unless and until a leave of absence is approved by the Company, an employee is
required to call in and report their Absence for each day of work missed.</u>  Prior to
returning to work from a leave due to a medical condition that rendered an employee
unable to work, the employee must provide medical certification that they have been
released to return to work.

## SCHEDULED TIME OFF

The Company recognizes that on occasion an employee may not be able to avoid
taking time off from work due to medical appointments, family matters, school related
matters or similar functions.  Employees shall be provided with sixteen (16) hours of
excused unpaid Scheduled Time Off per calendar year.  Scheduled Time Off may be
used in increments of 2 hours.  Scheduled Time Off may only be used when the
employee has provided their supervisor with at least 24 hours advanced notification of
the need to take time off from work.  While the Company will make every effort to honor
an employee's request for Scheduled Time Off, there may be occasions where the
request must be denied due to production requirements.

Scheduled Time Off cannot be used to excuse an absence the day immediately before
or the day immediately after a paid holiday.  Scheduled Time Off does not have to be
used in conjunction with an approved leave of absence.

## CHRONIC ABSENTEEISM

This Attendance Policy attempts to establish a generally acceptable level of
absenteeism while allowing for some flexibility in the event of unforeseen
circumstances.  However, an employee who on average carries 5 or more attendance
points on their record for a period of 18 or more months has Chronic Absenteeism.  The
Company will work with such an employee to improve their overall attendance record.
However, an employee who is unable or unwilling to improve their overall attendance
record will be subject to termination of employment.

It is not good enough to simply avoid being assessed 9 points under this Attendance
Policy.  In other words, employees who consistently carry 5 or more points are either
missing a substantial amount of production time and/or failing to properly notify the
Company of their Absence and/or Early Departure on a regular basis.  Such conduct
and behavior is unacceptable and will not be tolerated by the Company.

## PERFECT ATTENDANCE AWARD

An employee who maintains perfect attendance for a complete calendar year
(January 1 through December 31) will be eligible to receive the Perfect Attendance
Award.  Perfect attendance is defined as not having received any attendance points for

the duration of the calendar year.  The Perfect Attendance Award will be paid out as
follows:

| | |
|---|---|
| 1 year | $100 |
| 2 consecutive years | $125 |
| 3 consecutive years | $150 |
| 4 consecutive years | $200 |
| 5 – 9 consecutive years | $250 |
| 10 or more consecutive years | $300 |

**Parking Spot:**  The ten (10) associates with the longest period of perfect attendance
will be given an assigned parking place.  Any break in perfect attendance will remove
you from the assigned parking spot immediately upon recording of the absence.

## EXAMPLE OF ASSESSMENT OF ATTENDANCE POINTS

| Date | Occurrence | Attendance Points Assessed | Point Total |
|---|---|---|---|
| February 15, 2005 | Late Arrival (2 hours or less) | .5 | .5 |
| March 10, 2005 | Absence with Call-In | 2 | 2.5 |
| April 5, 2005 | Early Departure (more than 2 hours) | 1 | 3.5 |
| May 6, 2005 | Scheduled Time Off | 0 | 3.5 |

Employee, who is scheduled to work 6:00 a.m. to 3:00 p.m., wants to attend a school-related function for their child. Employee provides 24 hours advanced notice and supervisor approves (24 hour advanced notification requires notice prior to the start of the shift on May 5, 2005). Employee misses first 4 hours of work and uses Scheduled Time Off to cover.

| | | | |
|---|---|---|---|
| August 12, 2005 | Absence without Call-In | 3 | 6.5 |
| August 15, 2005 | Employee gains back points assessed based on six (6) month basis measured backwards from February 15, 2005 | - .5 | 6.0 |
| August 15, 2005 | Early Departure (more than 2 hours) | 1 | 7.0 |

On August 12, 2005, employee has been assessed more than 6 points and should receive a written warning. However, before the Company could meet with the employee there was an additional incident. The additional points stand since it is the employee's responsibility to be aware of their overall attendance record. The employee is now an incident away from termination of employment. Any additional time missed from work will require planning and the use of Scheduled Time Off.

| | | | |
|---|---|---|---|
| September 10, 2005 | Employee gains back points assessed on March 10, 2005 | - 2 | 5.0 |
| October 5, 2005 | Employee gains back points assessed on April 5, 2005 | - 1 | 4.0 |
| November 15, 2005 | Scheduled Time Off | 0 | 4.0 |

Employee timely uses 2 hours of scheduled time off to cover a doctor's appointment.

| | | | |
|---|---|---|---|
| December 31, 2005 | Employee completes year with 2 hours of unpaid Scheduled Time Off, which this time does not carryover. | | |

6

| Date | Occurrence | Attendance Points Assessed | Point Total |
|---|---|---|---|
| January 1, 2006 | Employee starts the year with 4.0 points and 16 hours of unpaid Scheduled Time Off. | | |
| April 6, 2006 | Absence with Call-In | 2 | 6.0 |
| April 7, 2006 | Absence covered with Scheduled Time Off (approved 24 hr advance) | 0 | 6.0 |
| April 8, 2006 | Absence covered with Scheduled Time Off (approved 24 hr advance) | 0 | 6.0 |
| Employee missed 3 consecutive days of work due to their own medical condition. At the time, the employee had 16 hours of Scheduled Time Off but no remaining vacation time. Employee is assessed 2 points for the first day's Absence on April 6. No points are assessed for the Absence on April 7 & 8 due to the employee's ability to cover this absence with Scheduled Time Off (assuming an 8 hour Scheduled Shift). | | | |
| April 11, 2006 | Absence with no call in | 3 | 9.0 |
| Employee will be notified of the termination of their employment for violation of the Attendance Policy. | | | |

An employee who is able to cover all time missed from work in a calendar year with Scheduled Time Off (i.e., no attendance points are assessed for the entire calendar year) qualifies for the Perfect Attendance Award. An employee with perfect attendance in 2005 will receive $100 (less tax) on payroll check in January 2006. If the employee has perfect attendance for a second consecutive year, the employee will receive $125 (less tax) in January 2007.

# EXHIBIT 2

DEFENDANT'S EXHIBIT 2

CLK100P
PAGE: 2

COUCH  6/21  8:13

iSeries Timekeeper   Schrock - Auburn
PUNCH DETAIL HISTORY
1/01/05 THRU 6/01/06

| DAY | DATE | ROUNDED IN | OUT | | DAILY | NOTES | ACTUAL IN | OUT | SCHEDULED IN | OUT | PAY CODE | HOURS | AP | LABOR LVLS | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAT | 2/26/05 | 5:00 | 12:06 U | | 11 | A | 4:55 | 12:10 | | | | 6.60 | 1 | 01-5436 | 354.10 |
| MON | 2/28/05 | | TRANS | | 11 | | 0:00 | | 0:00 | 14:30 | VA | 4.00 | 1 | 01-5436 | 358.20 |
| TUE | 3/01/05 | 5:00 | 13:42 | | 11 | A | 4:55 | 13:42 | 5:00 | 14:30 | | 8.20 | 1 | 01-5436 | 366.40 |
| WED | 3/02/05 | 5:00 | 14:00 E | | 11 | A | 4:57 | 14:04 | 5:00 | 14:30 | | 8.50 | 1 | 01-5436 | 374.90 |
| THU | 3/03/05 | 5:00 | 13:30 E | | 11 | A | 4:55 | 13:35 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 382.90 |
| FRI | 3/04/05 | 5:00 | 13:30 E | | 11 | A | 4:55 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 390.90 |
| MON | 3/07/05 | 5:00 | 14:00 E | | 11 | A | 4:53 | 14:00 | 5:00 | 14:30 | | 8.50 | 1 | 01-5436 | 399.40 |
| TUE | 3/08/05 | 5:00 | 13:48 E | | 11 | A | 4:56 | 13:49 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 407.70 |
| WED | 3/09/05 | 5:00 | 13:30 E | | 11 | A | 4:55 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 415.70 |
| THU | 3/10/05 | 5:00 | 13:30 E | | 11 | A | 4:55 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 423.70 |
| FRI | 3/11/05 | 5:00 | 13:30 | | 11 | | 4:54 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 431.70 |
| MON | 3/14/05 | 5:00 | 12:00 E | | 11 | A | 4:58 | 12:00 | 5:00 | 14:30 | | 6.50 | 1 | 01-5436 | 438.20 |
| TUE | 3/15/05 | | TRANS | | 11 | | 0:00 | | 0:00 | | EL | 1.50 | 1 | 01-5436 | 448.20 |
| WED | 3/16/05 | 5:00 | 14:00 | | 11 | A | 4:53 | 14:00 | 5:00 | 14:30 | | 4.00 | 1 | 01-5436 | 452.20 |
| THU | 3/16/05 | | TRANS | | 11 | | 0:00 | | 0:00 | | VA | 4.50 | 1 | 01-5436 | 456.70 |
| THU | 3/17/05 | 5:00 | 9:30 E | | 11 | A | 4:50 | 9:32 | 5:00 | 14:30 | | 9.60 | 1 | 01-5436 | 466.30 |
| FRI | 3/18/05 | 5:00 | 15:06 L | | 11 | A | 4:55 | 15:11 | 5:00 | 14:30 | | 9.20 | 1 | 01-5436 | 475.50 |
| SAT | 3/19/05 | 5:00 | 14:30 | | 11 | | 4:54 | 14:30 | 5:00 | 14:30 | | 3.80 | 1 | 01-5436 | 479.10 |
| SAT | 3/19/05 | | TRANS | | 11 | | 0:00 | | 0:00 | | EL | 4.00 | 1 | 01-5436 | 483.50 |
| MON | 3/21/05 | 5:00 | 9:12 E | | 11 | A | 4:51 | 9:17 | 5:00 | 14:30 | | 9.50 | 1 | 01-5436 | 492.30 |
| TUE | 3/22/05 | 5:00 | 14:30 | | 11 | A | 4:55 | 15:00 | 5:00 | 14:30 | | 4.00 | 1 | 01-5436 | 501.80 |
| WED | 3/23/05 | 5:00 | 15:00 L | | 11 | A | 4:55 | 15:00 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 505.80 |
| WED | 3/23/05 | | TRANS | | 11 | | 0:00 | | 0:00 | | VA | .10 | 1 | 01-5436 | 513.80 |
| THU | 3/24/05 | 5:00 | 9:00 E | | 11 | A | 4:56 | 9:02 | 5:00 | 14:30 | | 7.10 | 1 | 01-5436 | 518.80 |
| FRI | 3/25/05 | 5:00 | 14:36 L | | 11 | A | 4:54 | 14:36 | 5:00 | 14:30 | | 1.90 | 1 | 01-5436 | 526.80 |
| MON | 3/28/05 | | TRANS | | 11 | | 0:00 | | 0:00 | | HONP TA | 9.00 | 1 | 01-5436 | 526.90 |
| MON | 3/28/05 | | TRANS | | 11 | | 0:00 | | 0:00 | | AB | 9.00 | 1 | 01-5436 | 534.00 |
| MON | 3/28/05 | 5:06 | 7:00 E | | 11 | A | 5:01 | 7:00 | 5:00 | 14:30 | | 9.20 | 1 | 01-5436 | 535.90 |
| TUE | 3/29/05 | 5:00 | 14:30 | | 11 | A | 4:54 | 14:35 | 5:00 | 14:30 | | 8.50 | 1 | 01-5436 | 544.90 |
| WED | 3/30/05 | 5:00 | 14:30 | | 11 | A | 4:54 | 14:31 | 5:00 | 14:30 | | 9.50 | 1 | 01-5436 | 553.90 |
| THU | 3/31/05 | 5:00 | 14:42 | | 11 | A | 4:54 | 14:46 | 5:00 | 14:30 | | 9.00 | 1 | 01-5436 | 563.10 |
| FRI | 4/01/05 | 5:00 | 14:42 | | 11 | A | 4:51 | 14:47 | 5:00 | 14:30 | | 9.00 | 1 | 01-5436 | 572.30 |
| SAT | 4/01/05 | | TRANS | | 11 | A | 4:48 | 13:30 | 5:00 | 14:30 | | 8.90 | 1 | 01-5436 | 580.80 |
| MON | 4/02/05 | 5:00 | 15:00 L | | 11 | A | 4:52 | 15:00 | 5:00 | 14:30 | | 9.70 | 1 | 01-5436 | 590.30 |
| TUE | 4/05/05 | 5:00 | 15:00 L | | 11 | A | 4:55 | 15:30 | 5:00 | 14:30 | | 9.00 | 1 | 01-5436 | 599.30 |
| WED | 4/06/05 | 5:00 | 14:30 | | 11 | A | 4:54 | 14:32 | 5:00 | 14:30 | | 9.00 | 1 | 01-5436 | 607.70 |
| THU | 4/07/05 | 5:00 | 14:30 | | 11 | A | 4:54 | 14:27 | 5:00 | 14:30 | | 9.00 | 1 | 01-5436 | 617.30 |
| FRI | 4/08/05 | 5:00 | 14:24 | | 11 | A | 4:54 | 14:30 | 5:00 | 14:30 | | 7.50 | 1 | 01-5436 | 625.20 |
| MON | 4/11/05 | 5:00 | 14:48 | | 11 | A | 4:54 | 14:48 | 5:00 | 14:30 | | 7.50 | 1 | 01-5436 | 634.50 |
| TUE | 4/12/05 | 5:00 | 15:12 | | 11 | A | 4:54 | 15:15 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 644.20 |
| WED | 4/13/05 | 5:00 | 14:30 | | 11 | A | 4:54 | 14:32 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 653.20 |
| THU | 4/14/05 | 5:00 | 14:30 | | 11 | Y | 4:54 | 14:38 | 5:00 | 14:30 | | 7.50 | 1 | 01-5436 | 662.20 |
| FRI | 4/15/05 | 5:00 | 14:00 | | 11 | A | 4:55 | 14:03 | 5:00 | 14:30 | | 7.50 | 1 | 01-5436 | 670.70 |
| SAT | 4/19/05 | 5:00 | 13:30 | | 11 | A | 4:56 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 678.20 |
| WED | 4/20/05 | 5:00 | 13:00 E | | 11 | A | 4:56 | 13:01 | 5:00 | 14:30 | | 8.00 | 1 | 01-5436 | 686.20 |
| THU | 4/21/05 | 5:00 | 13:00 | | 11 | A | 4:54 | 13:01 | 5:00 | 14:30 | | 7.50 | 1 | 01-5436 | 694.20 |
| FRI | 4/22/05 | | TRANS | | 11 | | 0:00 | | 0:00 | | VA | 7.50 | 1 | 01-5436 | 701.70 |
| FRI | 4/22/05 | 5:00 | 9:00 E | | 11 | A | 4:55 | 9:05 | 5:00 | 14:30 | | 4.00 | 1 | 01-5436 | 709.20 |
| MON | 4/25/05 | 5:00 | 14:48 L | | 11 | A | 4:55 | 14:50 | 5:00 | 14:30 | | 4.00 | 1 | 01-5436 | 717.20 |
| TUE | 4/26/05 | 5:00 | 14:30 J | | 11 | A | 4:52 | 14:31 | 5:00 | 14:30 | | 9.30 | 1 | 01-5436 | 726.50 |
| | | | | | | | | | | | | 9.00 | 1 | 01-5436 | 735.50 |

CLK100P
PAGE: 3

iSeries Timekeep    Schrock - Auburn
PUNCH DETAIL HISTORY
1/01/05 THRU 6/01/06

COUCH 6/21  8:13

| DAY | DATE | ROUNDED IN | ROUNDED OUT | DAILY | NOTES | ACTUAL IN | ACTUAL OUT | SCHED IN | SCHED OUT | PAY CODE | HOURS | AP | LABOR LVLS | TOTAL HOURS |
|-----|------|-----------|------------|-------|-------|-----------|-----------|----------|-----------|----------|-------|----|-----------|-------------|
| WED | 4/27/05 | 5:00 | 14:00 | 11 E | A | 4:55 | 14:04 | 5:00 | 14:30 | | 8.50 | 1 | 01.5436 | 744.00 |
| THU | 4/28/05 | 5:00 | 14:18 | 11 | A | 4:56 | 14:18 | 5:00 | 14:30 | | 8.80 | 1 | 01.5436 | 752.80 |
| FRI | 4/29/05 | 5:00 | 14:48 | 11 E | A | 4:55 | 14:49 | 5:00 | 14:30 | | 9.30 | 1 | 01.5436 | 762.10 |
| MON | 5/02/05 | 5:00 | 13:30 | 11 | A | 4:55 | 13:52 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 770.10 |
| TUE | 5/03/05 | 5:00 | 14:30 | 11 E | A | 4:51 | 14:30 | 5:00 | 14:30 | | 9.00 | 1 | 01.5436 | 779.10 |
| WED | 5/04/05 | 5:00 | 14:30 | 11 | A | 4:55 | 14:41 | 5:00 | 14:30 | | 9.00 | 1 | 01.5436 | 788.10 |
| THU | 5/05/05 | 5:00 | 14:30 | 11 | A | 4:55 | 14:34 | 5:00 | 14:30 | | 9.00 | 1 | 01.5436 | 797.10 |
| FRI | 5/06/05 | 5:00 | 14:30 | 11 | A | 4:54 | 14:31 | 5:00 | 14:30 | | 9.00 | 1 | 01.5436 | 806.10 |
| MON | 5/09/05 | 5:00 | 14:30 | 11 E | A | 4:51 | 14:33 | 5:00 | 14:30 | | 9.00 | 1 | 01.5436 | 815.10 |
| WED | 5/11/05 | 5:00 | 14:30 | 11 | A | 4:51 | 14:34 | 5:00 | 14:30 | | 9.00 | 1 | 01.5436 | 824.10 |
| THU | 5/12/05 | 5:00 | 14:48 | 11 | A | 4:53 | 14:52 | 5:00 | 14:30 | | 9.30 | 1 | 01.5436 | 833.40 |
| FRI | 5/13/05 | 5:00 | 14:12 | 11 E | A | 4:52 | 14:14 | 5:00 | 14:30 | | 8.70 | 1 | 01.5436 | 842.10 |
| SAT | 5/14/05 | 5:00 | 13:05 | 11 | A | 4:52 | 13:05 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 850.10 |
| MON | 5/16/05 | 5:00 | 13:00 | 11 | A | 4:54 | 14:07 | 5:00 | 14:30 | | 7.50 | 1 | 01.5436 | 857.60 |
| TUE | 5/17/05 | 5:00 | 14:30 | 11 E | A | 4:55 | 14:33 | 5:00 | 14:30 | | 8.60 | 1 | 01.5436 | 866.20 |
| WED | 5/18/05 | 5:00 | 13:30 | 11 | A | 4:53 | 13:30 | 5:00 | 14:30 | | 9.00 | 1 | 01.5436 | 875.20 |
| THU | 5/19/05 | 5:00 | 13:18 | 11 E | A | 4:52 | 13:31 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 883.20 |
| FRI | 5/20/05 | 0:00 | TRANS | 11 | | 0:00 | 0:00 | 5:00 | 14:30 | EL | 8.00 | 1 | 01.5436 | 891.20 |
| MON | 5/23/05 | 5:00 | 10:06 | 11 | A | 4:54 | 10:06 | 5:00 | 14:30 | | 2.90 | 1 | 01.5436 | 894.10 |
| TUE | 5/24/05 | 5:00 | 13:51 | 11 E | A | 4:51 | 13:51 | 5:00 | 14:30 | | 5.10 | 1 | 01.5436 | 899.20 |
| WED | 5/25/05 | 5:00 | 14:54 | 11 | A | 4:54 | 14:54 | 5:00 | 14:30 | | 5.30 | 1 | 01.5436 | 907.50 |
| THU | 5/26/05 | 5:00 | 14:18 | 11 E | A | 4:52 | 14:19 | 5:00 | 14:30 | | 9.40 | 1 | 01.5436 | 916.90 |
| FRI | 5/27/05 | 5:00 | 13:42 | 11 | A | 4:53 | 13:43 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 924.90 |
| MON | 5/30/05 | 0:00 | TRANS | 11 | | 0:00 | 0:00 | 5:00 | 14:30 | HO | 8.50 | 1 | 01.5436 | 933.40 |
| TUE | 5/31/05 | 5:00 | 13:30 | 11 | A | 4:55 | 13:30 | 5:00 | 14:30 | | 7.80 | 1 | 01.5436 | 941.20 |
| WED | 6/01/05 | 5:00 | 13:30 | 11 | A | 4:56 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 949.00 |
| THU | 6/02/05 | 5:00 | 13:30 | 11 | A | 4:53 | 13:33 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 957.00 |
| FRI | 6/03/05 | 5:00 | 13:31 | 11 E | A | 4:57 | 13:31 | 5:00 | 14:30 | | 9.00 | 1 | 01.5436 | 966.00 |
| MON | 6/06/05 | 5:00 | 13:32 | 11 | A | 4:51 | 13:32 | 5:00 | 14:30 | | 9.20 | 1 | 01.5436 | 975.20 |
| TUE | 6/07/05 | 5:00 | 13:30 | 11 E | A | 4:54 | 13:34 | 5:00 | 14:30 | | 8.30 | 1 | 01.5436 | 983.50 |
| WED | 6/08/05 | 5:00 | 13:30 | 11 | A | 4:57 | 13:33 | 5:00 | 14:30 | | 9.00 | 1 | 01.5436 | 992.50 |
| THU | 6/09/05 | 5:00 | 13:42 | 11 | A | 4:51 | 13:42 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1000.50 |
| FRI | 6/10/05 | 5:00 | 13:30 | 11 E | A | 4:52 | 13:32 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1008.50 |
| MON | 6/13/05 | 5:00 | 13:43 | 11 | A | 4:57 | 13:43 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1016.50 |
| TUE | 6/14/05 | 5:00 | 13:30 | 11 | A | 4:55 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1024.50 |
| WED | 6/15/05 | 5:00 | 13:42 | 11 E | A | 4:53 | 13:42 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1032.50 |
| THU | 6/16/05 | 5:00 | 13:30 | 11 | A | 4:54 | 13:35 | 5:00 | 14:30 | | 8.20 | 1 | 01.5436 | 1040.50 |
| FRI | 6/17/05 | 5:00 | 13:30 | 11 | A | 4:55 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1048.70 |
| MON | 6/20/05 | 5:00 | 13:30 | 11 | A | 4:55 | 13:32 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1056.70 |
| TUE | 6/21/05 | 5:00 | 13:30 | 11 E | A | 4:54 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1064.70 |
| WED | 6/22/05 | 5:00 | 13:30 | 11 | A | 4:55 | 13:35 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1072.70 |
| THU | 6/23/05 | 5:00 | 13:30 | 11 | A | 4:54 | 13:33 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1080.70 |
| FRI | 6/24/05 | 5:00 | 13:30 | 11 E | A | 4:57 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1088.70 |
| MON | 6/27/05 | 5:00 | 13:30 | 11 | A | 4:55 | 13:33 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1096.70 |
| TUE | 6/28/05 | 5:00 | 13:30 | 11 | A | 4:55 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1104.70 |
| WED | 6/29/05 | 5:00 | 13:30 | 11 | A | 4:55 | 13:35 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1112.70 |
| THU | 6/30/05 | 5:00 | 13:30 | 11 E | A | 4:55 | 13:32 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1120.70 |
| FRI | 7/01/05 | 5:00 | 13:30 | 11 | A | 4:54 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1128.70 |
| MON | 7/04/05 | 0:00 | TRANS | 11 | A | 0:00 | 0:00 | 5:00 | 14:30 | HO | 8.00 | 1 | 01.5436 | 1136.70 |
| TUE | 7/05/05 | 5:00 | 13:30 | 11 E | A | 4:54 | 13:33 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1144.70 |
| WED | 7/06/05 | 5:00 | 13:30 | 11 | A | 4:56 | 13:34 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1152.70 |
| | | | | | | | | | | | | | | 1160.70 |
| | | | | | | | | | | | | | | 1168.70 |

CLK100P
PAGE:1

COUCH 6/21   8:13

**iSeries Timekeep   Schrock - Auburn**
**PUNCH DETAIL HISTORY**
**1/01/05 THRU 6/01/06**

| DAY | DATE | ROUNDED IN | ROUNDED OUT | | DAILY | NOTES | ACTUAL IN | ACTUAL OUT | SCHEDULED IN | SCHEDULED OUT | PAY CODE | HOURS | AP | LABOR LVLS | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THU | 7/07/05 | 5:00 | 13:30 | E | 11 | A | 4:56 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1176.70 |
| FRI | 7/08/05 | 5:00 | 13:30 | E | 11 | | 4:56 | 13:33 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1184.70 |
| MON | 7/11/05 | 5:00 | 13:30 | E | 11 | | 4:55 | 13:33 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1192.70 |
| TUE | 7/12/05 | 5:00 | 13:30 | E | 11 | | 4:54 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1200.70 |
| WED | 7/13/05 | 5:00 | 13:30 | E | 11 | A | 4:54 | 13:30 | 5:00 | 14:30 | | 8.00 | 1 | 01.5436 | 1208.70 |
| THU | 7/14/05 | 5:00 | 14:00 | E | 11 | | 4:55 | 14:00 | 5:00 | 14:30 | | 8.50 | 1 | 01.5436 | 1217.20 |
| FRI | 7/15/05 | 5:00 | 13:48 | E | 11 | A | 4:51 | 13:51 | 5:00 | 14:30 | | 8.30 | 1 | 01.5436 | 1225.50 |
| MON | 7/18/05 | 5:00 | 14:00 | E | 11 | A | 4:57 | 14:05 | 5:00 | 14:30 | | 8.50 | 1 | 01.5436 | 1234.00 |
| TUE | 7/19/05 | 5:00 | 15:24 | | 11 | A | 4:55 | 15:27 | 5:00 | 13:30 | | 9.90 | 1 | 01.5436 | 1243.90 |
| WED | 7/20/05 | 5:00 | 13:30 | | 11 | A | 4:55 | 13:31 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1251.90 |
| THU | 7/21/05 | 5:00 | 12:30 | | 11 | | 12:30 | 12:50 | 5:00 | 13:30 | PI | 1.70 | 1 | 01.5436 | 1258.90 |
| FRI | 7/22/05 | | TRANS | | 11 | | 5:53 | 14:12 | 5:00 | 13:30 | PI | 6.20 | 1 | 01.5436 | 1260.60 |
| MON | 7/25/05 | | TRANS | | 11 | | 0:00 | 12:56 | 0:00 | 13:30 | VA | 8.00 | 1 | 01.5436 | 1266.80 |
| TUE | 7/26/05 | | TRANS | | 11 | | 0:00 | | 0:00 | 13:30 | VA | 8.00 | 1 | 01.5436 | 1274.80 |
| WED | 7/27/05 | | TRANS | | 11 | | 0:00 | | 0:00 | 13:30 | VA | 8.00 | 1 | 01.5436 | 1282.80 |
| THU | 7/28/05 | | TRANS | | 11 | | 0:00 | | 0:00 | 13:30 | VA | 8.00 | 1 | 01.5436 | 1290.80 |
| FRI | 7/29/05 | | TRANS | | 11 | | 0:00 | | 0:00 | 13:30 | VA | 8.00 | 1 | 01.5436 | 1298.80 |
| MON | 8/01/05 | 5:00 | 13:30 | J | 11 | A | 4:51 | 13:30 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1306.80 |
| TUE | 8/02/05 | 5:00 | 13:48 | | 11 | A | 4:53 | 13:53 | 5:00 | 13:30 | | 8.30 | 1 | 01.5436 | 1314.80 |
| WED | 8/03/05 | 5:00 | 13:50 | | 11 | A | 4:56 | 13:52 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1323.10 |
| THU | 8/04/05 | 5:00 | 15:30 | | 11 | A | 4:54 | 13:32 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1331.10 |
| FRI | 8/05/05 | 5:00 | 13:30 | | 11 | A | 4:54 | 13:43 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1339.10 |
| MON | 8/08/05 | 5:00 | 13:30 | | 11 | A | 4:54 | 13:35 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1347.10 |
| TUE | 8/09/05 | | TRANS | | 11 | | 0:00 | | 0:00 | | VA | 8.00 | 1 | 01.5436 | 1355.10 |
| WED | 8/10/05 | 5:00 | 13:30 | | 11 | A | 4:55 | 9:00 | 5:00 | 9:00 | | 8.00 | 1 | 01.5436 | 1363.10 |
| THU | 8/11/05 | 5:00 | 13:48 | J | 11 | A | 4:56 | 13:49 | 5:00 | 13:30 | | 4.00 | 1 | 01.5436 | 1367.10 |
| FRI | 8/12/05 | 5:00 | 13:50 | | 11 | A | 4:57 | 13:55 | 5:00 | 13:30 | | 4.00 | 1 | 01.5436 | 1371.10 |
| MON | 8/15/05 | 5:00 | 15:30 | J | 11 | A | 4:56 | 13:52 | 5:00 | 13:30 | | 8.30 | 1 | 01.5436 | 1379.40 |
| TUE | 8/16/05 | 5:00 | 15:30 | | 11 | A | 4:46 | 14:17 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1387.40 |
| WED | 8/17/05 | 5:00 | 13:12 | | 11 | A | 4:54 | 13:32 | 5:00 | 13:30 | | 8.40 | 1 | 01.5436 | 1395.80 |
| THU | 8/18/05 | 5:00 | 14:12 | | 11 | A | 4:54 | 13:42 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1403.80 |
| FRI | 8/19/05 | 5:00 | 13:42 | | 11 | A | 4:53 | 13:32 | 5:00 | 13:30 | T1 | 8.70 | 1 | 01.5436 | 1412.50 |
| MON | 8/22/05 | 5:00 | 15:54 | | 11 | A | 4:56 | 15:57 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1420.50 |
| TUE | 8/23/05 | | TRANS | | 11 | A | 4:56 | 9:00 | 5:00 | 9:00 | | 8.20 | 1 | 01.5436 | 1428.70 |
| WED | 8/24/05 | | TRANS | | 11 | A | 0:00 | | 0:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1436.70 |
| THU | 8/25/05 | 5:12 | 16:18 | | 11 | A | 5:10 | 15:46 | 5:00 | 13:30 | | 10.40 | 1 | 01.5436 | 1447.10 |
| FRI | 8/26/05 | 5:00 | 17:24 | | 11 | A | 4:54 | 16:18 | 5:00 | 13:30 | | 0.20 | 1 | 01.5436 | 1447.30 |
| MON | 8/29/05 | 5:00 | 15:00 | | 11 | A | 4:47 | 17:25 | 5:00 | 13:30 | | 10.00 | 1 | 01.5436 | 1457.30 |
| TUE | 8/30/05 | 5:00 | 15:42 | | 11 | A | 4:53 | 15:00 | 5:00 | 13:30 | | 10.80 | 1 | 01.5436 | 1468.10 |
| WED | 8/31/05 | | TRANS | | 11 | A | 4:55 | 14:43 | 5:00 | 13:30 | | 11.90 | 1 | 01.5436 | 1480.00 |
| THU | 9/01/05 | | TRANS | | 11 | A | 4:54 | 13:31 | 5:00 | 13:30 | | 9.50 | 1 | 01.5436 | 1489.50 |
| FRI | 9/02/05 | 5:00 | 14:12 | | 11 | A | 0:00 | | 0:00 | 0:00 | AB | 9.20 | 1 | 01.5436 | 1498.70 |
| MON | 9/05/05 | 5:00 | 13:30 | | 11 | | 0:00 | 0:00 | 0:00 | 13:30 | PS | 8.00 | 0 | 01.5436 | 1506.70 |
| TUE | 9/06/05 | | TRANS | | 11 | | 0:00 | 14:14 | 0:00 | 13:30 | HONP | 8.00 | 1 | 01.5436 | 1514.70 |
| WED | 9/07/05 | | | | 11 | | 4:48 | 13:36 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1522.70 |
| THU | 9/08/05 | 5:00 | 15:00 | | 11 | A | 5:02 | 15:00 | 5:00 | 13:30 | | 8.00 | 1 | 01.5436 | 1530.70 |
| FRI | 9/09/05 | 5:06 | 14:00 | J | 11 | A | 4:54 | 14:00 | 5:00 | 13:30 | T1 | 9.40 | 1 | 01.5436 | 1539.40 |
| MON | 9/12/05 | 5:00 | 13:54 | | 11 | A | 4:55 | 13:55 | 5:00 | 13:30 | | 8.50 | 1 | 01.5436 | 1547.40 |
| TUE | 9/13/05 | 5:00 | 15:30 | | 11 | A | 4:52 | 15:31 | 5:00 | 13:30 | | 8.40 | 1 | 01.5436 | 1556.80 |
| | | | | | | | | | | | | 10.00 | 1 | 01.5436 | 1565.30 |