IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| RONNIE GILES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 3:06-cv-528-WKW |
| ) | (WO) |
| MASTERBRAND CABINETS, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ronnie Giles ("Giles") brings this action against Masterbrand Cabinets, Inc. ("MBCI") alleging retaliation for taking a leave of absence under the Family and Medical Leave Act, 29 U.S.C.§§ 2601-2654 ("FMLA"). Before the court is MBCI's fully briefed Motion for Summary Judgment (Doc. # 25). Because there are genuine issues of material fact, the motion is due to be denied.

**I. FACTS AND PROCEDURAL HISTORY**

Giles took FMLA leave from December 19, 2005, through January 2, 2006, for a shoulder injury. (Giles Dep. at 48-51.) MBCI's human resources manager, Perry Ezell ("Ezell"), approved the leave. (Ans. to Pl.'s Interrog. # 12.) Giles's team leader, John Oleinick ("Oleinick"), coded Giles's leave into the computer system. (*Id.*) Giles returned to work on January 3, 2006, and worked all day. (Giles Dep. at 51-52.) He left work early on January 4, 2006, due to illness, and was absent the next two days. (Ezell Aff. ¶ 14, Giles Dep. 99-102.) When he informed Oleinick on January 4 that he was leaving work, Oleinick responded, "We're in the same fix as we were before." (Giles Dep.54.) He returned to work on January 7, 2006, but Oleinick sent him home. (*Id.* at 105,

114.) On January 9, 2006, Ezell informed Giles that he was terminated as required by MBCI's attendance policy. (*Id.* at 114-15; Termination Letter.)[1] MBCI listed in its interrogatory answers both Oleinick and Ezell as "person(s) making the decision(s) as to any disciplinary action taken against Plaintiff." (Ans. to Pl.'s Interrog. # 5f.) MBCI now claims only Ezell had authority to terminate Giles. (Def.'s Reply at 6.)

On July 18, 2005, MBCI instituted the "Attendance Policy" (" Policy") (Deft.'s Ex. to Mot. Summ. Judg. Doc. # 27-3),[2] which controls this action. Giles signed the Policy on July 15, 2005. (Doc. # 27-3.) The Policy establishes an attendance point system. If an employee accumulates nine points within a six month period, he is automatically terminated. ( Policy at 3.) Points are assessed when an employee is tardy, is absent, leaves early, takes an unscheduled break during the work day, or fails to notify MBCI of an impending absence prior to the shift which the employee will not work. The relevant formulas for assigning points to events are as follows:

- Tardy under 2 hours  =  .5
- Tardy over 2 hours  =  1
- Early departure under 2 hours  =  .5
- Early departure over 2 hours  =  1
- Absence  =  2 (though an employee is assessed only 1 point for each absence which follows consecutively after the first if the absences are related, stem from a medical condition of the employee or of a dependant child, were timely reported, and if the employee has exhausted all "scheduled time off" and "vacation")
- Failure to call in  =  1

(*Id*. at 2.)

---

[1] As will be seen, however, MBCI has submitted two versions of the termination letter. See *infra* note 2.

[2] For convenience, this exhibit will hereafter be referred to as "Doc. # 27" with internal exhibit designation included where appropriate.

An employee is not assessed points if his absence is due to "approved vacations" or "scheduled time off." (*Id*. at 4.) Each employee receives sixteen hours of scheduled time off, which is unpaid leave "due to medical appointments, family matters, school related matters or similar functions." (*Id.*) An employee must ask to use scheduled time off twenty-four hours in advance and must receive permission. (*Id.*) Employees receive vacation time based on their years of employment with MBCI. "Vacations . . . should be scheduled as far in advance as possible." (Vacation Policy, Doc. # 27, Ex. D.) The vacation policy is contained in the employee handbook, not in the Policy.

The Policy also allows employees to use scheduled time off and vacation time to avoid the accumulation of absentee points. This practice is explained in the Policy:

> An employee who is required to miss consecutive work days due to their own medical condition . . . shall only be assessed one (1) point per day following the initial absence. An employee shall only be entitled to this reduced point schedule provided the employee timely reports each day's absence on the Absence Line *and the employee has exhausted all Scheduled Time Off and Vacation.*
>
> **Example:** Dependant child wakes up sick on Thursday morning. Employee timely calls in to report his/her absence. Dependent child remains sick on Friday and Saturday (employee is scheduled to work both days but is unable to work because the employee does not have dependent care). Employee must timely call in to report each day's absence. At the time of the dependent child's illness, the employee has 2 hours of Scheduled Time Off and 8 hours of vacation time remaining.
>
> Under this scenario, Thursday counts as an Absence so the employee will be assessed 2 points. Friday's absence from work can be covered by Scheduled Time Off and vacation time (assuming this employee is scheduled to work no more than 10 hours). The employee may be able to partially cover their absence from work on Saturday with the remaining hours of vacation, if any. If Saturday cannot be covered with vacation, the employee would be assessed one additional point provided he/she timely reports the Absence.

( Policy at 3) (emphasis added.)

It is undisputed that Giles had accumulated 5.5 points when he returned to work on January 3, 2007. (Giles Dep. 93-97; Ezell Aff. ¶ 9.) He left work due to sickness on January 4 having worked 2.1 hours. (Ezell Aff. ¶ 14.) Thus he accumulated a point and reached 6.5 points. (Giles dep. 71-72.) The Policy requires a written warning at six points, but no such warning was given to Giles. He was absent the next two days, but he timely called in each absence. (*Id*. at 99-103.) At the time of his termination, Giles had eighty hours of vacation time and sixteen hours of scheduled time off. (Ezell Aff. ¶ 25.)

## II. JURISDICTION AND VENUE

Because this case arises under the FMLA, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations supporting both.

## III. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing

4

the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

The FMLA grants an employee a private right of action to seek money damages against an employer who retaliates against him for exercising rights otherwise protected by the FMLA. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). An employee's FMLA retaliation claim, when challenged by a motion for summary judgment, is examined under the *McDonnell Douglas* burden shifting analysis if the employee does not have direct evidence of retaliation. *Hurlbert*, 439 F.3d at 1297, citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The plaintiff must establish a prima facie case by showing "that: (1) he engaged in statutorily protected activity; (2) he experienced an adverse employment action; and (3) there is a

causal connection between the protected activity and the adverse action." *Hulbert*, 439 F.3d at 1297 (internal citations omitted). If the plaintiff succeeds in establishing a prima facie case, the defendant must articulate a legitimate reason for the adverse action. *Id*. Finally, if the defendant articulates a legitimate reason, the plaintiff may only defeat the motion for summary judgment by producing sufficient evidence that the defendant's proffered legitimate reason is pretextual. *Id*.

The court construes disputed facts in favor of the non-movant, as it must.

### A.   *Prima Facie Case*

MBCI argues that Giles's prima facie case fails as to the third element. There is no dispute that Giles's FMLA leave constitutes protected activity and nor that Giles's termination constitutes an adverse employment action. MBCI asserts that Giles can demonstrate no causal connection between Giles's FMLA leave and his termination. Where the decision maker had knowledge of the protected activity, close temporal proximity is sufficient to establish a causal connection for purposes of the plaintiff's prima facie case. *Hulbert*, 439 F.3d at 1298. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citations omitted). The court finds that Ezell, who claims to be the sole decision maker, had knowledge of Giles's FMLA activities, and that seven days is sufficient to establish temporal proximity.[3]

---

[3] It could be five days. Defendant has produced two different versions of the termination letter. At Giles's deposition, counsel for the defendant handed Giles what was marked as "Defendant's Exhibit 9", a version of the termination letter which referred to "the company's decision to terminate your employment with MBCI effective January 7, 2006." (Doc. # 27, Ex. 1.) However, in the same evidentiary submission in support of its Motion for Summary Judgment, MBCI submitted a version of the letter consistent with January 9, 2006, as a termination date. (Doc. # 27, Ex. 8.) The parties did not address this discrepancy in their briefing. The January 7 version of the letter

Moreover, a causal connection is suggested by Oleinick's statement, "We're in the same fix as we were before."[4] Uttered a mere twenty seven hours after Giles returned from FMLA leave, the implication is that Oleinick was referring to the "fix" that Giles's leave presumably created for the company.[5] MBCI has offered no alternative, non-retaliatory explanation for the meaning of the comment. Giles has presented sufficient evidence for the trier of fact to conclude that causation existed. A prima facie case therefore precludes summary judgment at this stage of the analysis.

### B.    *Legitimate Reason and Pretext*

The issue of whether MBCI has proffered a legitimate reason for terminating Giles' employment that is not pretextual requires contract interpretation.[6]

MBCI claims termination was mandated by the Policy because Giles reached the 9-point absentee threshold and he failed to ask for and receive permission to use his vacation or scheduled time off to avoid the accumulation of absentee points. Giles had sufficient vacation and scheduled time off to cover his absences and to avoid reaching a 9-point absentee balance. The Policy example, which describes the use of banked time to avoid an accumulation of absentee points, suggests that an employee does not have to ask permission. It states, "Friday's absence from work can be covered by Scheduled Time Off and vacation (assuming this employee is scheduled to work no more than 10 hours)." The example is careful to further explain the exact steps that an employee *must* take to

---

may factor into the dispute as to the extent of Oleinick's involvement in the termination.

[4] MBCI insists that, while Oleinick could discipline Giles, only Ezell could terminate him. The inconsistent termination letters may bear on this point.

[5] The attendance policy stresses MCBI's production schedule: "The failure to maintain prompt and regular attendance adversely impacts the Company's production schedule." (Doc. # 27-3 at 2.)

[6] The court assumes, for purposes of this discussion only, that the reason offered by MBCI was legitimate.

comply with the Policy, including that the employee must timely call in to report his absence. However, there is no mention of a requirement that an employee must receive permission to have his absences covered by vacation or scheduled time off. What the employee must do to notify the company that he would like to use his banked time to avoid an accumulation of absentee points is not stated. The Policy, silent as to *the procedure* for applying scheduled time off to one's absentee point balance, nonetheless leaves *the right* to apply the hours firmly established. MBCI asserts that there is an unwritten policy that requires the employee to ask, and that MBCI applies that policy consistently. This dispute raises a genuine issue of material fact.

      This conclusion is strengthened by the provision of the Policy requiring the use of banked time to avoid accumulation of absentee points: "An employee shall only be entitled to this reduced point schedule provided the employee timely reports each day's absence and *the employee has exhausted all Scheduled Time Off and Vacation.*" (Policy at 2) (emphasis added). Thus, an employee gets reduced points if banked time has been exhausted. Presumably, because it is not said but is implied, the employee would get no points if he or she were able to use unexhausted scheduled time off or vacation to cover the absence. This language not only *requires* exhaustion of banked time but it clearly creates a link between banked time and absentee points. The language of the Policy bears no hint of a trap for the unwary who fail to ask the company to make the adjustment.

      MBCI argues that the scheduled time off and vacation language of the policy make it clear that an employee must ask and receive permission to use scheduled time off or to take a vacation. "Scheduled Time Off may only be used when the employee has provided their supervisor with at least 24 hours advanced notification of the need to take time off from work. . . . [T]here may be occasions where the request must be denied due to production requirements." (Policy at 4.)

"Vacations . . . should be scheduled as far in advance as possible. . . . Each team leader will determine the maximum number of associates who may be on vacation." ( Doc. # 27, Ex. D.) Examining the language above, MBCI argues that these passages refer not just to using scheduled time off - for example, to attend a medical appointment or to take a vacation from work to spend time with one's family – but also to applying one's scheduled time off or vacation time to one's absentee point balance. After all, one is *using* scheduled time off, MBCI argues, when one applies it to one's absentee point balance.

MBCI's argument misses the point in several respects. First, the court finds that these vacation policy passages do not refer to the practice of applying banked time to one's absentee point balance. Requiring an employee to ask in advance and receive permission to use scheduled time off or vacation time enables the company to schedule work as efficiently as possible. That interest does not exist when it comes to applying banked time to one's absentee point balance. No absence can be prevented by denying an employee the ability to use his scheduled time off or vacation time in that way. The absence, for which the employee seeks to avoid an increase in absentee points, has already taken place. Thus, the purpose behind requiring an employee to seek and receive permission to use scheduled time off and to take a vacation does not apply to using banked time to avoid an accumulation of absentee points. Taking a vacation, scheduled in advance, and foregoing future vacation in order to avoid an accumulation in absentee points are two different processes with two different purposes. Moreover, the vacation policy in the employee handbook makes no mention of scheduled time off, absentee points or policy, or any relationship among them. Any written policy with respect to absences from work resides solely in the Policy.

Finally, MBCI's reading of the language contradicts the example given in the Policy as to treatment of the second day of absence due to sickness of the employee or child of an employee – "Friday's absence from work can be covered by Scheduled Time Off and vacation time . . . ." This analysis is provided in the Policy despite the acknowledged fact that on Friday the employee could not give 24 hours notice of the absence as other terms of the Policy require. In that respect, the court finds the Policy to be inherently contradictory and inconsistent and, thus, ambiguous.[7]

MBCI argues further that it has an *unwritten* policy not to automatically apply vacation or scheduled time off to an employee's absentee point balance. That assertion raises two issues. First, if MBCI claims that it has a written *and* an unwritten policy regarding the same subject matter, then there are questions of fact as to the content of, in fact, their "full" or "total" policy, how that policy was or is communicated to employees, and whether that policy was in fact communicated to Giles. Moreover, the unwritten policy underscores the position that the use of banked time to cover absences is, arguably, a matter of employee discretion, not company discretion. MBCI does not automatically apply the time because the employee has the right to apply his scheduled time off and vacation time if he desires. This is perfectly reasonable in that an employee with no attendance points might prefer to take the points rather than use scheduled time off or vacation time. The court likewise finds the claim of an unwritten policy to be contradictory to the written policy and inconsistent with its express language. There remains a genuine issue of material fact as to the content of the Policy.

---

[7] When the court finds ambiguity, the fact finder resolves the ambiguity. See *Lackey v. Central Bank*, 710 So. 2d 419, 422 (Ala. 1998).

To show pretext, Giles is required to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for the actions that a reasonable fact finder could find them unworthy of credence." *Daugherty v. Mikart, Inc.*, No. 06-13016, 2006 WL 3724150, at *1 (11th Cir. Dec. 19, 2006). The court finds that Giles has proffered sufficient evidence of pretext to meet his *McDonnell Douglas* burden. There is temporal proximity between the use of Giles's FMLA leave and his termination. The Policy is contradictory and inconsistent when applied to Giles. It is unclear, thus creating a genuine issue of material fact, who could discipline Giles for absences and to what extent his ability to discipline affected the termination decision, in view of the MBCI producing two explanations for who could discipline or terminate Giles and two versions of the termination letter with different and inconsistent termination dates. If the trier of fact determines that Giles's immediate supervisor had something to do with his termination, then his statement as to "being in the same fix as before" is evidence of pretext and discrimination. The absence of a written warning at six points, as required by the Policy, is also a weakness or inconsistency in the proffered legitimate reason for termination.[8]

By returning to work on Saturday, Giles expressed his desire to retain his employment. Using scheduled time off or vacation time to avoid an accumulation of absentee points would be the only way Giles could avoid termination. No procedure is set out in the Policy regarding the notice an employee must provide MBCI that he wants to use his banked time against attendance points.

---

[8] It is the business of the trier of fact to assess the effect of the circumstances surrounding the accumulation of the sixth point, but it is undisputed the MBCI never issued or attempted to issue the written warning. It is likewise in the province of the trier of fact to weigh the consequences of Giles's failure to specifically request application of banked time to his absentee points.

Because sufficient evidence of pretext has been proffered by Giles, summary judgment must be denied.

## V. CONCLUSION

For the reasons stated above, it is ORDERED that the Motion for Summary Judgment (Doc. # 25) is DENIED.

DONE this 3rd day of August, 2007.

                                            /s/ W. Keith Watkins
                                        UNITED STATES DISTRICT JUDGE